**Robert E. GABLE, Plaintiff–
Appellant/Cross–
Appellee,**

v.

**Paul E. PATTON, in his official capacity
as Governor of the Commonwealth of
Kentucky; A.B. Chandler, III, in his of-
ficial capacity as Attorney General of
the Commonwealth of Kentucky; Ken-
tucky Registry of Election Finance;
Donald L. Cox, in his official capacity as
Chair of the Kentucky Registry of Elec-
tion Finance; Morris E. Burton, in his**

official capacity as Franklin County Commonwealth Attorney; James E. Boyd, in his official capacity as Franklin County Attorney; John Y. Brown, III, in his official capacity as Secretary of State for the Commonwealth of Kentucky, Defendants–Appellees/Cross–Appellants.

Nos. 96–6451, 96–6475.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 2, 1997.

Decided April 30, 1998.

Robert L. Abell (argued and briefed), Edward E. Dove (briefed), Lexington, KY, for Robert E. Gable.

Virginia H. Snell (briefed), Wyatt, Tarrant & Combs, Louisville, KY, for Paul E. Patton.

William B. Pettus (briefed), Assistant Attorney General, Office of the Attorney General, Civil & Environmental Law Division, Frankfort, KY, for A.B. Chandler, III.

Susan S. Wettle (briefed), Sheryl G. Snyder (argued and briefed), Griffin Terry, Brown, Todd & Heyburn, Louisville, KY, Jacquelyn P. Eckert (briefed), Louisville, KY, for Kentucky Registry of Election Finance and Donald L. Cox.

Susan S. Wettle (briefed), Sheryl G. Snyder (argued and briefed), Brown, Todd & Heyburn, Louisville, KY, William B. Pettus (briefed), Assistant Attorney General, Office of the Attorney General, Civil & Environmental Law Division, Frankfort, KY, Jacquelyn P. Eckert (briefed), Louisville, KY, for Morris E. Burton and James E. Boyd.

Susan S. Wettle (briefed), Sheryl G. Snyder (argued and briefed), Brown, Todd & Heyburn, Louisville, KY, John E. Kuhn, Jr.

(briefed) Office of the U.S. Attorney, Louisville, KY, William B. Pettus (briefed), Asstistant Attorney General, Office of the Attorney General, Civil & Environmental Law Division, Frankfort, KY, Jacquelyn P. Eckert (briefed), Louisville, KY, for Johnny Y. Brown, III.

Dennis M. Flannery (briefed), Wilmer, Cutler & Pickering, Washington, DC, Richard V. Beliles (briefed), Prospect, KY, for Common Cause, Common Cause of Kentucky and League of Women Voters of Kentucky.

Sheryl G. Snyder (argued and briefed), Susan S. Wettle (briefed), Brown, Todd & Heyburn, Louisville, KY, Virginia H. Snell (briefed), Wyatt, Tarrant & Combs, Louisville, KY, William B. Pettus (briefed), Office of the Attorney General, Civil & Environmental Law Division, Frankfort, KY, Jacquelyn P. Eckert (briefed), Louisville, KY, John E. Kuhn, Jr. (briefed), Office of the U.S. Attorney, Louisville, KY, for Appellees.

Dennis M. Flannery (briefed), Wilmer, Cutler & Pickering, Washington, DC, Richard V. Beliles (briefed), Prospect, KY, for Amicus Curiae.

Before: NORRIS, SUHRHEINRICH, and CUDAHY *, Circuit Judges.

SUHRHEINRICH, J., delivered the opinion of the court, in which NORRIS, J., joined. CUDAHY, J. (pp. 953–955), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

SUHRHEINRICH, Circuit Judge.

Plaintiff Robert E. Gable, a candidate for governor in Kentucky's 1995 Republican primary, brought suit challenging numerous provisions of Kentucky's campaign finance and election laws on First Amendment grounds. Several of the provisions involve Kentucky's optional public funding scheme, in which Plaintiff chose not to participate. Defendants include various state and county officials, as well as the Kentucky Registry of Election Finance (hereinafter Registry), the state agency charged with enforcing campaign finance laws. The district court granted summary judgment for Defendants, except with regard to one aspect of one statutory provision, for which summary judgment was granted for Plaintiff. Plaintiff's appeal involves four of the provisions ruled on by the court. Defendants' cross-appeal challenges the one issue that was decided in Plaintiff's favor. We **AFFIRM** the district court's decision in all respects.

## I.  Provisions Challenged On Appeal

This appeal and cross-appeal challenges the district court's decision with regard to four provisions of Kentucky's campaign finance and election laws. These four provisions include:

(1) Ky.Rev.Stat. § 121.190(1) (hereinafter the Sponsor Identification provision), which requires that all advertisements advocating the election of a particular candidate contain identification of the sponsor. This provision explicitly includes "posters," "circulars," and "handbills," and it this aspect of the provision which Plaintiff challenges.[1]

(2) Ky.Rev.Stat. § 118.127 (hereinafter the Slating provision), which requires candidates for governor and lieutenant governor to run in their party's primary as part of a single slate, rather than running individually.[2]

---

* The Honorable Richard D. Cudahy, Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. The Sponsor Identification provision applies to "[a]ll newspaper or magazine advertising, posters, circulars, billboards, handbills, sample ballots, and paid-for television or radio announcements which expressly advocate the election or defeat of a clearly identified candidate, slate of candidates, or group of candidates for nomination or election to any public office." Ky.Rev.Stat. § 121.190(1). The required identification consists of "the words 'paid for by' followed by the name and address of the individual or committee which paid for the communication; except that if paid for by a candidate, slate of candidates, or campaign committee, it shall be identified only by the words 'paid for by' followed by the name." *Id.*

2. Plaintiff's challenge to the Slating requirement cites Ky.Rev.Stat. §§ 118.125 and 118.127 in tandem, but § 118.125 is only tangentially related to the requirement.

(3) Ky.Rev.Stat. § 121A.030(5) (hereinafter the 28–Day Window), which prohibits all gubernatorial candidate slates, including those electing not to participate in public funding (hereinafter nonparticipating slates), from accepting contributions during the twenty-eight days preceding a primary or general election.[3] This prohibition applies to candidates' contributions to their own campaigns, as well as to contributions from outside sources. The 28–Day Window does not affect funds which are already in the slate's campaign account at the beginning of the 28–day period.

(4) Ky.Rev.Stat. § 121A.030(5)(a) (hereinafter the Trigger), which affects the $1.8 million campaign spending limit. *Id.* § 121A.030(1). The limit applies separately to the primary and general elections and affects only those slates which elect to participate in public funding (hereinafter participating slates). When a non-participating slate collects more than $1.8 million in campaign funds in a primary or general election, including contributions from the candidates themselves, the Trigger is activated.[4] The result is that the $1.8 million spending limit for participating slates is lifted, and the 28–Day Window is lifted for all slates. Before the Trigger is activated, participating slates may raise up to $600,000, *id.* § 121A.060(1), which, when combined with two-for-one matching public funds, *id.* § 121A.060(3)(c), results in campaign funds of up to $1.8 million. After the Trigger is activated, a participating slate may raise an unlimited amount of money, all of which is matched by the two-for-one public funding.[5]

The district court granted summary judgment with respect to all four provisions above. It held the 28–Day Window to be unconstitutional with regard to non-participating candidates contributing to their own campaigns, and that decision is contested in Defendants' cross-appeal. In all other respects, the four provisions were found to be constitutional, forming the basis for Plaintiff's appeal. Because the four provisions are challenged with regard to facial constitutionality, thus implicating only issues of law, neither Plaintiff nor Defendants contest the appropriateness of summary judgment. For the same reason, our standard of review is de novo. *See Kentucky Right To Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir.), *cert denied*, —— U.S. ——, 118 S.Ct. 162, 139 L.Ed.2d 106 (1997). Under that standard, we **AFFIRM** the district court's decision with respect to each of the four provisions challenged on appeal.

## II. The Sponsor Identification Provision

The Sponsor Identification provision, Ky.Rev.Stat. § 121.190(1), requires that advertisements supporting a particular candidate contain identification of the sponsor. Defendants maintain that this provision provides an essential means of detecting violations of various contribution and spending limits in Kentucky's campaign finance scheme. Plaintiff claims that the provision violates his First Amendment right to free speech, inasmuch as it prohibits *anonymous* handbills, posters, circulars, and the like. He argues that 1) these forms of communication involve expenditures too modest to implicate a compelling state interest, and 2) without a compelling state interest, the burden on First Amendment freedoms imposed by the Sponsor Identification provision cannot survive constitutional scrutiny. In particular, Plaintiff points to Kentucky's requirement that anyone making *more than* $500 in independent expenditures on behalf of candidates in a single election must report the expenditures to the Registry. *Id.* §§ 121.150(1), 121A.010(13). Plaintiff argues that this threshold represents the state's judgment

---

**3.** Prior to a 1996 amendment to the statute, the window was thirty days long instead of twenty eight. A fourteen-day window applies to primary *runoff* elections.

**4.** In a primary *runoff* election, a $300,000 ceiling and triggering threshold is substituted for the $1.8 million figures. Ky.Rev.Stat. § 121A.030(1).

**5.** A participating slate is not eligible for matching funds until 1) it has raised at least $300,000, Ky.Rev.Stat. § 121A.060(1), and 2) an opposing slate (whether participating or not) has raised at least $300,000. *Id.* § 121A.060(13). The latter provision is intended to prevent the use of public funds in uncontested elections.

that modest expenditures of less than $500 are too small for the state to assert a compelling interest in regulating them.

· The district court initially enjoined enforcement of the Sponsor Identification provision, but ultimately upheld it as constitutional. The court found that although the provision infringes on First Amendment rights, it survives strict scrutiny, because it is narrowly tailored to meet the state's compelling interest in enforcing its campaign finance laws and thereby combating corruption.

After the notices of appeal and cross-appeal had been filed in this case, we upheld the Sponsor Identification provision in *Kentucky Right To Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir.1997), *cert denied,* —— U.S. ——, 118 S.Ct. 162, 139 L.Ed.2d 106 (1997). This court's reasoning in *Kentucky Right To Life* was similar to that of the district court in the instant case. We conceded that the Sponsor Identification provision "clearly implicates First Amendment protection because it burdens core political speech [and thus] it must be narrowly tailored to serve an overriding state interest." *Id.* at 648 (citation and internal quotation marks omitted). However, we held that the provision is constitutional because it is narrowly tailored toward achieving two "substantial governmental interests," namely (1) it "prevents actual and perceived corruption by immediately notifying the public of any possible allegiance a particular candidate may feel toward the publisher," and (2) it "provides the Registry with a method of detecting those expenditures which are not truly independent." *Id.*[6]

Plaintiff introduces an argument not raised in *Kentucky Right To Life*, namely that sponsor identification cannot be constitutionally required on handbills, posters, circulars, and the like. While *Kentucky Right To Life* does not foreclose an as-applied constitutional challenge by someone convicted of distributing a small number of anonymous circulars, Plaintiff's challenge to the constitutionality of the Sponsor Identification provision is facial.

Plaintiff's introduction of a new legal argument does not provide a basis for us to distinguish the instant case from *Kentucky Right To Life*, which did not make any distinctions regarding the type of advertisement or amount of money expended. As *Salmi v. Secretary of Health and Human Services*, 774 F.2d 685, 689 (6th Cir.1985), explained, "[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." Neither of these conditions have occurred. Therefore, we affirm the district court's holding that the Sponsor Identification provision is constitutional.

## III. The Slating Provision

The Slating provision, Ky.Rev.Stat. § 118.127, requires candidates for governor and lieutenant governor to run in their party's primary as part of a single slate. The district court held the provision to be constitutional, rejecting Plaintiff's claim that it violates his First Amendment right to freedom of association. Plaintiff argues that the Slating provision dictates the terms of his association with his chosen political party, both in his capacity as a member and as a candidate in the party's primary. In sum, Plaintiff contends that the provision dictates to him and his party "how they may perform one of their most integral functions: selection of their general election candidates."

### A. Standing

██ As a preliminary matter, we must consider whether Plaintiff has standing to challenge the Slating provision, an issue not addressed by the district court. Defendants contend that Plaintiff does not have standing, because he does not have the prerogative to decide how his party's candidates will be selected. The "associational rights that he identifies are not his personally, but are

---

**6.** Detection of expenditures which are not truly independent is important, because money spent on a genuine "independent expenditure," *see* Ky. Rev.Stat. § 121A.010(13), is not counted as a contribution under other provisions of Kentucky's campaign finance laws, *e.g., the* 28–Day Window and the $1.8 million ceiling.

those only of the Republican Party," Defendants argue. They add that, even if this court were to confer *jus tertii* standing on Plaintiff, he could not assert the rights of an unincorporated association like his party, because he did not plead the claim as a class action.

Plaintiff argues that he has standing to make the freedom of association claim based on 1) his participation in candidate selection as a party member, and 2) his candidacy in the party's primary. We conclude that Plaintiff's argument is correct, at least with regard to his status as a party member. The Supreme Court has repeatedly stated that "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957); *accord Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 215, 107 S.Ct. 544, 549, 93 L.Ed.2d 514 (1986); *Democratic Party of U.S. v. Wisconsin ex rel. LaFollette*, 450 U.S. 107, 122, 101 S.Ct. 1010, 1019–20, 67 L.Ed.2d 82 (1981); *see also* Julia E. Guttman, *Primary Elections and the Collective Right of Freedom of Association*, 94 Yale L.J. 117, 117 n.3 (1984) ("In the past, when a political party has brought suit, it has alleged an infringement of the rights of its members. Thus, when a political party can sue, any party member could also sue.").

### B. Substantive Issues

■ Defendants argue that, even if Plaintiff does have standing to challenge the Slating provision, the challenge must fail because 1) the provision merely regulates Plaintiff's access to the ballot, without affecting his freedom of association, and 2) the provision is supported by a compelling state interest in preventing "factionalism," i.e., dissension between the governor and lieutenant governor. The district court used similar reasoning in upholding the Slating provision. It found that "Gable may be as free in his political association as he chooses," because the provision does not restrict Gable's choice of a running mate for his slate. The court conceded that the provision did burden Gable's right to access the ballot, but concluded that

even that burden was slight. Finally, the court found that "[i]t is undisputed that Kentucky's interest in preventing factionalism and in stabilizing government are recognized as compelling.... [This interest was] born of years of attempting to cope with factionalism in the gubernatorial race."

The district court found that evaluation of the constitutionality of the Slating provision was governed by the standard set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). We agree. Although *Anderson* struck down Ohio's early filing deadline for independent presidential candidates, finding it to be an unconstitutional burden on the voting and associational rights of the candidates' supporters, the Court stated that:

[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.... Each provision of these [regulations], whether it governs the registration and qualifications of voters, the *selection and eligibility of candidates*, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

*Id.* at 788, 103 S.Ct. at 1569–70 (emphasis added) (citation and internal quotation marks omitted). Like the district court, we find the Slating provision to be just such a reasonable, nondiscriminatory restriction. As a matter of fact, the burden this provision places on Plaintiff appears relatively small compared to the example in *Anderson* of a reasonable, nondiscriminatory ballot access restriction. That example involved a state "requir[ing] candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Id.* at 788 n. 9, 103 S.Ct. at 1570 n. 9.

The modest burden placed on Plaintiff's "right to associate with others for political ends" is clearly justified by "the State's important regulatory interests." *Id.* at 788, 103

S.Ct. at 1570. *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), noted that "the Founding Fathers [believed] that splintered parties and unrestrained factionalism may do significant damage to the fabric of government," *id.* at 736, 94 S.Ct. at 1281, leading the Court to conclude that "the State's interest in the stability of its political system [is] not only permissible, but compelling." *Id.* While Plaintiff contends that Kentucky's proffered interest in ameliorating factionalism is "nothing more than a claim of right to assure the ideological compatibility of a party's general election candidates," this is not so much an argument as it is a pejorative rephrasing of what the Supreme Court has held to be a compelling state interest. Because the state's compelling interest clearly outweighs the modest burden on Plaintiff's constitutional rights, we affirm the district court's holding that the Slating provision is constitutional.

## IV. The Trigger Provision

The Trigger, Ky.Rev.Stat. § 121A.030(5)(a), is a mechanism whereby, when a non-participating slate collects more than $1.8 million in campaign funds in a primary or general election, the $1.8 million ceiling is lifted for participating slates, and the 28–Day Window is lifted for all slates. Defendants maintain that the Trigger provision is designed to encourage candidates to participate in Kentucky's campaign finance scheme, including its $1.8 million expenditure limit. They argue that the Trigger must be a part of that scheme "[i]n order to assuage the wholly legitimate fears of participating slates" that they will be "vastly outspent due to their agreement to accept spending limits." Defendants contend that the overall scheme serves a compelling state interest in minimizing the role of fundraising and "combat[ing] corruption by ending the money chase that has undermined the integrity of politicians and the faith of the public in the political process."

Plaintiff contends that the Trigger provision violates his First Amendment right to free speech. The crux of his claim is that the effect of the Trigger is to coerce him into limiting his campaign spending to $1.8 million, thereby forgoing protected speech. The alleged coercion flows from the fact that, if he exceeds the $1.8 million threshold by any amount, his campaign will potentially be "inundated" by the spending of participating slates, which will not only be released from their ceiling, but will continue to get unlimited two-for-one matching public funds. Put another way, Plaintiff asserts that there is a high "penalty" for his 1.8 millionth dollar of speech.

The district court held the Trigger provision to be constitutional, rejecting what it called a "benefit equals burden" argument predicated on the notion that benefits provided to participating slates by activation of the Trigger represent a penalty on Plaintiff's speech. However, the court conceded that "[t]here is no question but that the trigger provision ... restricts free political speech.... [S]peech will be stifled to some degree by the fear that the participating candidate will clearly 'outspend' the non-participating candidate once the cap is lifted, given the additional '2 to 1' funding." However, the court upheld the Trigger because "the state has a compelling interest in keeping campaign expenditures at levels that do not encourage actual or apparent corruption of the political process, i.e., to keep one candidate from essentially buying a campaign." [7]

To the extent that the district court relied upon Kentucky's interest in preventing candidates from buying victory, it erred in light of *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (upholding and striking down various portions of the Federal Election Campaign Act and related provisions), the seminal campaign finance case which "provides the constitutional framework for analyzing First Amendment

---

7. Similar reasoning was used in *Wilkinson v. Jones*, 876 F.Supp. 916 (W.D.Ky.1995), which also upheld Kentucky's Trigger provision. That court stated that even if "the trigger provision chills speech to some degree, we find that it is a narrowly tailored means which addresses a compelling state interest ... in encouraging candidates to accept public financing and its accompanying limitations which are designed to promote greater political dialogue among the candidates and combat corruption." *Id.* at 928.

challenges to campaign contribution regulations." *Kentucky Right To Life, Inc. v. Terry*, 108 F.3d 637, 647 (6th Cir.), *cert denied*, —— U.S. ——, 118 S.Ct. 162, 139 L.Ed.2d 106 (1997). The *Buckley* Court held that the "interest in equalizing the relative financial resources of candidates . . . is clearly not sufficient to justify . . . infringement of fundamental First Amendment rights." *Buckley*, 424 U.S. at 54, 96 S.Ct. at 651. However, "[t]he Supreme Court has consistently held that preventing perceived corruption is a compelling state interest." *Kentucky Right To Life*, 108 F.3d at 650–51. Hence, the district court has identified a state interest which can potentially justify the burden on Plaintiff's First Amendment rights.

■ We turn now to analyzing the extent of the burden on Plaintiff's First Amendment rights. In general, the public funding of candidates in return for their acceptance of expenditure limits is constitutional, *Buckley*, 424 U.S. at 57 n. 65, 96 S.Ct. at 653 n. 65, despite the potential for pressuring candidates into accepting the expenditure limits. However, as the district court succinctly stated, "although a statutorily created benefit does not per se result in an unconstitutional burden, such benefits could conceivably 'snowball' into a 'coercive' measure upon a non-participating candidate." *See Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 38 (1st Cir.1993) ("[T]here is a point at which [public financing] incentives stray beyond the pale, creating disparities so profound that they become impermissibly coercive."); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1550 (8th Cir. 1996) ("[T]he State's public financing package does not . . . create such a large disparity between benefits and restrictions that candidates are coerced to publicly finance their campaigns."); *Wilkinson v. Jones*, 876 F.Supp. 916, 929 (W.D.Ky.1995).

The district court gave an example of such coercion, stating that if Kentucky provided four dollars in matching funds, instead of the current two dollars, for every dollar raised by participating candidates, a non-participating candidate would have no way of remaining competitive once the $1.8 million ceiling was lifted. As a result, the court said, "the candidate would have no real choice but to participate in the scheme," making it unconstitutional. The doctrine that benefits provided to participating candidates can become unconstitutionally coercive, if they are overwhelming enough, follows logically from the holding in *Buckley* that involuntary limits on a candidate's campaign expenditures are unconstitutional. *See Buckley*, 424 U.S. at 58, 96 S.Ct. at 653–54. This holding would be rendered meaningless if the government could effectively force a candidate into accepting expenditure limits by providing overwhelming benefits to participating candidates.

Thus, the central question we are faced with is whether the substantial advantage the Trigger provides to participating candidates rises to the level of unconstitutional coercion. At the very least, the Trigger provision can be said to provide very strong incentives for participation in Kentucky's campaign finance scheme. Because of the Trigger, a nonparticipating candidate derives *no relative advantage* from the $1.8 million spending limit on his participating opponents. Yet, because his participating opponents receive two-for-one public funding, resulting in three dollars spent for every one dollar raised, there is a substantial cost for non-participation. Given the lack of balance between costs and advantages, there is only a narrow set of circumstances under which a candidate could make a financially rational decision not to participate. That situation is where the non-participating candidate intends to exceed the $1.8 million threshold and believes he will raise more than three times the funds his participating opponents can raise.

In this respect, the Trigger is certainly more coercive than the federal campaign finance scheme for presidential elections. Under that scheme, 26 U.S.C. §§ 9001–9042, candidates who accept an expenditure ceiling in return for public funding are not released from the ceiling regardless of how much their non-participating opponents spend. The federal scheme was upheld in *Republican Nat'l Comm. v. Federal Election Comm'n*, 487 F.Supp. 280, 283–88 (S.D.N.Y. 1980) (3–judge court), which was affirmed without comment by the Supreme Court, 445

U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980). However, the Court has not provided any guidance as to how much farther a campaign finance scheme can go in providing incentives for participation before it crosses the line and becomes unconstitutionally coercive.

The lower courts do not provide much guidance either, as there is little case law that is truly on point. However, the Eighth Circuit did uphold a provision of Minnesota's campaign finance law, which in some respects, goes further than the Trigger in strongly discouraging non-participation. *Rosenstiel v. Rodriguez*, 101 F.3d 1544 (8th Cir.1996). Like the Kentucky scheme, Minnesota's law permits publicly financed candidates to exceed an expenditure ceiling when their non-participating opponents raise funds in excess of a certain triggering amount. *Id.* at 1547. Minnesota's trigger provides a bigger advantage to participating candidates than does Kentucky's, because the triggering amount in Minnesota is less than the ceiling. *Id.* However, in other respects, the Minnesota scheme does not go as far as Kentucky's, because the public funding does not continue unabated after the ceiling is lifted. Instead, the amount of public funds a candidate may receive is limited to fifty percent of the ceiling amount. *Id.* at 1546.

Returning to Kentucky's scheme, it is clear that candidates are under financial pressure to participate, since participation will be the rational choice in the large majority of cases. However, a voluntary campaign finance scheme must rely on incentives for participation, which, by definition, means structuring the scheme so that participation is usually the rational choice. Were we to conclude that the incentives provided by Kentucky are unconstitutional, we would be making a distinction based on degree. In that sense, *Buckley* does provide some guidance. In upholding a one thousand dollar limit on campaign contributions by individuals, the Court stated that if "some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000. Such distinctions in degree become significant only when they can be said to amount to differences in kind."

*Buckley,* 424 U.S. at 30, 96 S.Ct. at 640 (citation and internal quotation marks omitted). We believe the same principle applies here. Absent a clearer form of coercion, we decline to find that the incentives inherent in the Trigger provision are different in kind from clearly constitutional incentives. Faced with a difference only in degree, we will not second guess the Kentucky legislature by applying a "scalpel" and declaring that Kentucky's scheme goes one step over the line of unconstitutional coercion, especially where, as here, the line is not a clear one. Therefore, we affirm the district court and hold that Kentucky's Trigger provision is constitutional.

## V. The 28–Day Window

The 28–Day Window, Ky.Rev.Stat. § 121A.030(5), prohibits all gubernatorial candidate slates from accepting contributions or contributing to their own campaigns during the twenty-eight days preceding a primary or general election. However, any money already in the slate's campaign account can be spent during this period. While it is clear that Kentucky can impose this prohibition on candidates who voluntarily participate in the state's public funding scheme, *see Buckley,* 424 U.S. at 57 n. 65, 96 S.Ct. at 653 n. 65 ("Congress may ... condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations."), the constitutionality of the prohibition on non-participating candidates is in question. Plaintiff, a non-participating candidate, contends that the 28–Day Window violates his First Amendment right to free speech, by limiting his political expression during the last twenty-eight days of a campaign. He argues that the Window violates his right to free association as well, because it interferes with his relationship with his contributors.

Defendants respond that the 28–Day Window is required in order to effectuate the Trigger, Ky.Rev.Stat. § 121A.030(5)(a), which, they claim, is an indispensable part of Kentucky's entire public funding scheme. Defendants maintain that the purpose of the 28–Day Window is to ensure that all contributions (including those to a candidate's own

campaign) are made before the final pre-election reporting date, so that, if a non-participating slate has exceeded the $1.8 million threshold, the Registry can detect it in time to activate the Trigger. Moreover, Defendants argue, the Trigger must be activated long enough before the election to allow participating slates a meaningful amount of time to solicit additional contributions.

The district court held the 28–Day Window to be constitutional with regard to contributions from outside sources (hereinafter *external contributions*), but held it to be unconstitutional with respect to non-participating candidates contributing to their own campaigns (hereinafter *internal expenditures*). Plaintiff challenges the court's decision on external contributions, while Defendants challenge the decision on internal expenditures. The key for analyzing both issues is *Buckley* and its holdings on provisions of the Federal Election Campaign Act of 1971, 86 Stat. 3, as amended by 88 Stat. 1263 (1974) (hereinafter the Federal Act). Two of those holdings are particularly important here. One, the *Buckley* Court upheld the Federal Act's limits on the amount of money that an individual or group could contribute to a candidate for federal office. *Buckley*, 424 U.S. at 23–36, 96 S.Ct. at 636–43. Two, the Court struck down, as unconstitutional, the Act's limits on a candidate's expenditure of his own money. *Id.* at 51–54, 96 S.Ct. at 650–52. Subsection A below analyzes the 28–Day Window with respect to external contributions, while subsection B looks at internal expenditures.

### A. External Contributions

■ Although the district court devoted three pages to discussing the constitutionality of the 28–Day Window with respect to internal expenditures, it devoted only one sentence to the issue of external contributions. Specifically, the court said that "*Buckley* legitimatizes limiting contributions from other sources during the reporting peri-

od." The district court is evidently referring to the holding in *Buckley* that the Federal Act's limits on the size of external contributions is constitutional. While *Buckley* found that these limits did burden free speech and free association to some extent, 424 U.S. at 20–23, 96 S.Ct. at 635–37, it also found that the burdens were justified.[8] The *Buckley* Court concluded that "[i]t is unnecessary to look beyond the Act's primary purpose to limit the actuality and appearance of corruption resulting from large individual financial contributions in order to find a constitutionally sufficient justification." *Id.* at 26, 96 S.Ct. at 638.

We accept Defendants' contention that the purpose of Kentucky's campaign finance scheme is also to limit the actuality and appearance of corruption, and that the 28–Day Window is an important part of that scheme. However, we disagree with the district court that *Buckley* is so clearly controlling that no further analysis is necessary. One reason for our disagreement is that *Buckley* addressed the First Amendment rights of *contributors*, whereas the instant case involves the right of a *candidate* to receive contributions. Another reason is that *Buckley* relied on "[t]he major evil ... [being] the danger of candidate dependence on *large* contributions," *id.* at 55, 96 S.Ct. at 652 (emphasis added), whereas the 28–Day Window makes no distinction based on contribution size. Consider the following conclusion by the *Buckley* Court:

> [A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication.... The quantity of communication by the contributor does not increase perceptibly with the size of his contribution.

*Id.* at 20–21, 96 S.Ct. at 635. That reasoning simply has no relevance in the instant case.

---

8. *Buckley* stated that the limits "impinge on protected associational freedoms [because] [m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common politi-

cal goals." *Buckley*, 424 U.S. at 22, 96 S.Ct. at 636. Although the Supreme Court was discussing the associational rights of contributors, the same argument can be made for Plaintiff's right to affiliate and pool resources with contributors.

Thus, the application of *Buckley* to the instant case is far from straightforward. Nonetheless, we would be ignoring the obvious if we maintained that the right of candidates to receive contributions emerged unfettered from the *Buckley* decision. The *Buckley* Court gave no indication that its decision would have been different had the right of candidates to receive contributions been asserted. To the contrary, *Buckley* sanctioned the fact that the Federal Act would force candidates to rearrange their fundraising by seeking out many small donors, instead of a few large ones. *Id.* at 21–22, 96 S.Ct. at 636 ("The overall effect of the Act's contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons."). The effect of the 28–Day Window with respect to external contributions is similar. Candidates will be forced to rearrange their fundraising by concentrating it in the period before the 28–Day Window begins. That is not a trivial restriction, but we read *Buckley* to say that such a restriction is justified by Kentucky's interest in combating corruption. We, therefore, affirm the district court's holding that the 28–Day Window is constitutional with respect to external contributions.

**B. Internal Expenditures**

■ In striking down the 28–Day Window with respect to internal expenditures, the district court relied on *Buckley* to conclude that "[t]here can be no doubt that a candidate cannot be restricted from contributing to and spending for his own candidacy." We essentially agree. The question of whether Kentucky can extend the 28–Day Window to internal expenditures by non-participating candidates is largely answered by the Supreme Court's clear statement that "the First Amendment simply cannot tolerate [the Federal Act's] restriction upon the freedom of a candidate to speak without legislative limit on behalf of his own candidacy." *Buckley*, 424 U.S. at 54, 96 S.Ct. at 651; *see*

*Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n*, 518 U.S. 604, 625–27, 116 S.Ct. 2309, 2321, 135 L.Ed.2d 795 (1996) (Kennedy, J., concurring in the judgment and dissenting in part) ("The central holding in [*Buckley* ] is that spending money on one's own speech must be permitted.").

The *Buckley* Court reached this conclusion primarily for two reasons. One, it found that "the Act's expenditure limitations impose far greater restraints on the freedom of speech and association than do its contribution limitations." *Buckley*, 424 U.S. at 44, 96 S.Ct. at 647.[9] Two, the Court found that "[t]he primary governmental interest [of preventing] actual and apparent corruption of the political process does not support the limitation on the candidate's expenditure of his own personal funds," *id.* at 53, 96 S.Ct. at 651, because a candidate cannot become beholden to himself. Indeed, as the Court pointed out, "the use of personal funds reduces the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse to which the Act's contribution limitations are directed." *Id.* The corruption-related interest cited by *Buckley* remains "the only legitimate and compelling government interest[ ] thus far identified for restricting campaign finances." *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 496–97, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985).

Because "[t]he central holding in [*Buckley* ] is that spending money on one's own speech must be permitted," *Colorado Republican Comm.*, 518 U.S. at 627, 116 S.Ct. at 2321 (Kennedy, J., concurring in the judgment and dissenting in part), there is little room for Defendants to maneuver in attempting to show that the 28–Day Window can be constitutionally applied to internal expenditures. Nonetheless, we consider one possible distinction between the 28–Day Window and the internal expenditure provisions struck down in *Buckley*. Although *Buckley* pointed out that a candidate's use of his own

---

**9.** In addition to limiting the amount a candidate could spend on his own campaign, the Federal Act 1) imposed a ceiling on overall expenditures by a candidate, and 2) limited the size of independent expenditures, i.e., those made "relative

to a clearly identified candidate," but not authorized or requested by the candidate. *Buckley*, 424 U.S. at 39, 96 S.Ct. at 644. All of these expenditure limitations were held to be unconstitutional in *Buckley*. *Id.* at 58, 96 S.Ct. at 653–54.

money does not lead to corruption, Kentucky's interest in preventing actual and apparent corruption is served by the 28–Day Window's application to internal expenditures, albeit indirectly. Extension of the 28–Day Window to internal expenditures increases the effectiveness of the Window, which increases the effectiveness of the Trigger, which, in turn, strengthens the incentives for participating in Kentucky's campaign finance scheme, a scheme which is clearly aimed at the prevention of actual and apparent corruption. However, we ultimately must conclude that a distinction based on this reasoning cannot rescue the constitutionality of the 28–Day Window's application to internal expenditures.

We reach that conclusion for several reasons. One, *Buckley* relies more on the extent of the First Amendment burden imposed by expenditure limits than it does on the weight of governmental interests. *See Pacific Gas & Elec. Co. v. Public Utils. Comm'n of Cal.*, 475 U.S. 1, 29 n. 2, 106 S.Ct. 903, 918–19 n. 2, 89 L.Ed.2d 1 (1986) (Rehnquist, J., dissenting) ("[T]he critical distinction [in *Buckley* ] between the contribution and expenditure limitations [is] not the relative worth of the respective governmental interests," but instead is the fact that expenditure "limits 'impose far greater restraints on the freedom of speech and association.'") (quoting *Buckley*, 424 U.S. at 44, 96 S.Ct. at 646–47). Two, *Buckley* stated that "[t]he markedly greater burden on basic freedoms caused by [the limit on independent expenditures] cannot be sustained simply by invoking the interest in maximizing the effectiveness of the less intrusive contribution limitations." *Buckley*, 424 U.S. at 44, 96 S.Ct. at 647. Similarly, we reject the argument that the greater burden imposed by the 28–Day Window's extension to internal expenditures can be justified by its impact on the effectiveness of the less intrusive Trigger provision. Three, the marginal increase in the effectiveness of the Trigger that is gained by extending the 28–Day Window to internal expenditures is obviously aimed at wealthy candidates. Indeed, Defendants argue that the extension "ensures that a candidate who is extremely wealthy will not be able to 'buy the election' with

unfettered and unopposed campaign power in the final days before votes are cast." Because the marginal increase is aimed at wealthy candidates, it provides an insufficient justification. *Buckley* found that the "interest in equalizing the relative financial resources of candidates ... is ·clearly not sufficient ·to justify the [internal expenditure] provision's infringement of fundamental First Amendment rights." *Id.* at 54, 96 S.Ct. at 651.

Defendants suggest another possible way to distinguish the 28–Day Window from the internal expenditure provision struck down in *Buckley*. They argue that the Window restricts contributions but not expenditures, because a gubernatorial candidate can spend as much of his personal funds as he wants during the 28–day period, as long as the money is already deposited in his slate's campaign account when the period begins. Though candidates are prohibited from contributing to their own accounts in the last twenty-eight days, Defendants maintain that the act of contributing to one's own account does not involve any expression. This distinction, too, must fail for a number of reasons.

To begin with, it is erroneous for Defendants to argue that contributions but not expenditures are prohibited in the last twenty-eight days. If a candidate were to desire, during those twenty-eight days, to spend additional amounts of his own money on the campaign, Defendants' argument would dismiss the additional money as merely a contribution, which could be prohibited. However, *Buckley* explicitly rejected a lower court's attempt to characterize "the personal funds expended by the candidate on his own behalf as a contribution rather than an expenditure." *Buckley*, 424 U.S. at 52–53 n. 58, 96 S.Ct. at 651 n. 58.

Defendants attempt to portray the requirement that a candidate deposit his personal funds in the campaign account before the twenty-eight days begin as little more than a financial technicality. However, it is much more than that, because it forces a candidate to decide in advance how much of his own money he will spend, before he has a

chance to assess the public opinion polls and actions of his opponents in the last month of the campaign. Moreover, it would simply not be feasible for a candidate to deposit virtually all of his personal resources in the campaign account in advance, just in case he decides, during the last twenty-eight days, to spend those resources on his campaign. First, it is unlikely that all of the candidate's personal resources will be liquid. Second, the mere deposit of his personal funds counts towards activating the Trigger. Third, the candidate cannot easily take back his money if it is unexpended at the end of the campaign.[10] In sum, it is disingenuous for Defendants to argue that the 28–Day Window does not burden a candidate's ability to spend personal funds on his own campaign.

██ Finally, Defendants attempt to distinguish the 28–Day Window from the provision struck down in *Buckley* by characterizing it as "merely a time, place and manner restriction." *Buckley* acknowledged that "the government may adopt reasonable time, place, and manner regulations, which do not discriminate among speakers or ideas, in order to further an important governmental interest unrelated to the restriction of communication." *Buckley*, 424 U.S. at 18, 96 S.Ct. at 634. However, the *Buckley* Court went on to conclude that the Federal Act's expenditure limits, and even its external contribution limits, do not fall into that category, because they "impose direct *quantity* restrictions on political communication and association." *Id.* (emphasis added). In the previous paragraph, we discussed the effects of prohibiting a candidate from contributing to his own campaign in the final month. Because the effects are substantial, rather than just being a matter of timing, we agree with the district court that "[i]t cannot be seriously argued that the prohibition at issue does not restrict the *quantity* of political speech" (emphasis added). Therefore, for the same reason cited by *Buckley*, the 28–Day Window cannot be

characterized as a mere time, place and manner restriction.

While we are sympathetic to the administrative goals of the 28–Day Window, we cannot distinguish it from the internal expenditure provision struck down in *Buckley*. Thus, we are bound by the Supreme Court's clear statement that "the First Amendment simply cannot tolerate" this type of restriction on the freedom of a candidate to speak on his own behalf. *Buckley*, 424 U.S. at 54, 96 S.Ct. at 651. Accordingly, we affirm the district court's holding that the 28–Day Window is unconstitutional when it prohibits a non-participating candidate from contributing to his own campaign.

## VI. Conclusion

We hold that Kentucky's Sponsor Identification provision, Ky.Rev.Stat. § 121.190(1), Slating requirement, *id.* § 118.127, and Trigger provision, *id.* § 121A.030(5)(a), are all constitutional. We further hold that the 28–Day Window, *id.* § 121A.030(5), is constitutional with respect to contributions from external sources. However, we hold that the 28–Day Window is unconstitutional when it prohibits a nonparticipating candidate from contributing to his own campaign. Thus, we **AFFIRM** the district court's decision in all respects.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the cogent majority opinion except Part V.B., which invalidates the 28–Day Window insofar as it prohibits candidates from contributing to their own campaigns during the final weeks before an election. As the majority explains, Kentucky's campaign finance system is designed to combat actual and apparent corruption. The 28–Day Window does not merely "indirectly" advance this goal as the majority suggests;

---

10. Under Ky.Rev.Stat. § 121.180(10), the unexpended funds in the campaign account of a participating slate shall "escheat to the State Treasury, be returned pro rata to all contributors, ... be transferred to the state or county executive committee of the political party of which the candidate is a member except that a candidate ... may retain the funds to ... seek election to the same office or may donate the funds to any charitable, nonprofit, or educational institution." Candidates cannot get around this provision by making large loans to their campaigns. *See id.* § 121.150(13) ("No candidates running as a slate ... shall make combined total personal loans to their committee in excess of fifty thousand dollars.").

instead the Window is crucial to the effectiveness of the entire Kentucky scheme and its invalidation threatens to derail this reform effort. The 28–Day Window is intended to preclude participating and non-participating candidates from infusing last-minute cash into their campaign coffers, too late to be reported and to allow a response by their opponents. The majority has approved this 28–Day Window to the extent that it limits contributions by supporters. But as a result of the majority's disallowance of the same limitation on self-financing, a candidate using his own funds will now be free to ambush an adversary with a torrent of new cash after the last reporting deadline, when a response is no longer possible. A provision that forbids this unfair practice should not require a defense.

To justify its result, the majority is not, as it claims, merely applying *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Instead, the majority is extending that case in a fashion that *Buckley* specifically forecloses. As the majority concedes, *Buckley* authorizes "reasonable time, place, and manner regulations, which do not discriminate among speakers or ideas, in order to further an important governmental interest unrelated to the restriction of communication," provided that the regulations do not impose "*direct* quantity restrictions on political communication and association." 424 U.S. at 18, 96 S.Ct. at 634 (emphasis added).

Here the purpose and effect of the 28–Day Window is to prohibit contributions at a highly sensitive time—within a few weeks or days of the election and after the last financial report has been made. Since this is the end of the campaign, total contributions *might* be less than if there were no such restrictions. But the prohibition applies directly and explicitly to *when* contributions are made; there is no impact on amount unless, without the restriction, a candidate decided on a last-minute contribution. Whether a candidate would make such a contribution is a matter of conjecture. *Compare id.* at 19, 96 S.Ct. at 635 ("The expenditure limitations contained in the Act represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech."). The pro-

vision before us therefore does not impose "direct quantity restrictions" and is not a violation of the *Buckley* principle.

Nor does the 28–Day Window involve the evil at which *Buckley* was aimed. *Buckley* was concerned that a candidate not be prohibited from contributing to, and spending money on, her own candidacy. *See id.* at 52–53, 96 S.Ct. at 651. Certainly that freedom is not at stake here. Candidates are free to make contributions, as frequently as they wish and of whatever magnitude they choose, before the advent of the 28–Day Window. The majority makes a number of unconvincing arguments about why this freedom fails to satisfy the requirements of the First Amendment. In particular, the majority has advanced the strawman that a candidate might need to "deposit virtually all of his personal resources" before the 28–day limit in the expectation of trouble to come. The reality would be simply that the candidate would put up something before the 28–Day Window (that she would be required to report) as a hedge against last-minute difficulties. If the difficulties did not materialize, it is likely that regular campaign expenses could absorb the surplus. In any event, if there were no last-minute problems requiring additional cash, the candidate's campaign no doubt went well, and she would be untroubled by any surplus.

All the 28–Day Window provides is *notice* that the contribution has been made and an opportunity for the opponent to respond. The provision thereby removes the unfairness of last-minute, unreported contributions. It is true that *Buckley* prohibits "restrict[ing] the speech of some elements of our society in order to enhance the relative voice of others." *Id.* at 48–49, 96 S.Ct. at 649. But that does not mean that the First Amendment protects the right to ambush an opponent. *Cf. First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 789, 98 S.Ct. 1407, 1422–23, 55 L.Ed.2d 707 (1978) ("If appellee's arguments were supported by . . . findings that . . . advocacy threatened imminently to undermine democratic processes, thereby denigrating rather than serving First Amendment interests, these arguments would merit our consideration.") (citing *Red Lion Broad-*

*casting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)). Nor do I believe that denying such a right would result, as the majority contends, in only a "marginal" increase in the effectiveness of the Trigger. The majority's logic here is not transparent. It may be saying that, since the application of the 28–Day Window is aimed at wealthy candidates, the effect is only marginal and cannot be a basis for disregarding *Buckley*'s injunction against attempting to equalize the financial resources of candidates. I am not sure how we can conclude that the effect of a last-minute cash infusion into a campaign that could be won by a single vote is only "marginal." However, if this is so, by the same token its prohibition cannot be a significant infringement of the First Amendment.

In sum, the majority is troubled that the 28–Day Window is a "burden" on a candidate's freedom to speak with her own dollars. But the alternative is to construct a special right to speak with unreported dollars at the last minute when no response is possible. I do not believe that the First Amendment requires such a perverse construction, and I therefore respectfully dissent with respect to this issue.