Hobart Ward **ANDERSON,**
et al., Plaintiffs,

v.

Lloyd E. **SPEAR,** in His Official Capacity as Commonwealth Attorney for Greenup County, Kentucky, and as Representative of the Class of Commonwealth Attorneys in the Commonwealth of Kentucky, et al., Defendants.

No. CIV.A. 99–189–JMH.

United States District Court,
E.D. Kentucky.

March 21, 2002.

John Kenneth Bush, Greenebaum, Doll & McDonald PLLC, Louisville, KY, James Bopp, Jr., Heidi K. Meyer, Justin David Bristol, Bopp, Coleson & Bostrom, Terre Haute, IN, for Hobart Ward Anderson, Hoby for the Commonwealth.

Sheryl G. Snyder, Amy Denise Cubbage, Frost Brown Todd LLC, Louisville, KY, Janet M. Graham, Attorney General's Office, Frankfort, KY, D. Brent Irvin, Office of the Atty. Gen., Frankfort, KY, Brenda

Kay Dinkins Allen, Office of the Atty. Gen., Civ. and Env. Law Div., Frankfort, KY, for Lloyd E. Spear.

Sheryl G. Snyder, Amy Denise Cubbage, Frost Brown Todd LLC, Louisville, KY, Janet M. Graham, Attorney General's Office, Frankfort, KY, Jennifer Black Hans, Rosemary F. Center, Kentucky Registry of Election Finance, Frankfort, KY, D. Brent Irvin, Office of the Atty. Gen., Frankfort, KY, for Michael C. Wilson, A. B. Chandler, III, John Y. Brown, III, Janie Bruce, Charles W. Buchanan, John Chowning, Dave Disponett, Hade Durbin.

Sheryl G. Snyder, Amy Denise Cubbage, Frost Brown Todd LLC, Louisville, KY, Jennifer Black Hans, Rosemary F. Center, Kentucky Registry of Election Finance, Frankfort, KY, for Donald L. Cox, Judith Grisham Clabes, Scott C. Cox, David Shawn Samford, Robert E. Sanders, John L. Smith.

Sheryl G. Snyder, Amy Denise Cubbage, Frost Brown Todd LLC, Louisville, KY, Janet M. Graham, Attorney General's Office, Frankfort, KY, D. Brent Irvin, Office of the Atty. Gen., Frankfort, KY, for John Caudill.

D. Brent Irvin, Office of the Atty. Gen., Frankfort, KY, for Clifford Duvall.

### *MEMORANDUM OPINION AND ORDER*

HOOD, District Judge.

### I. Introduction

This case presents a challenge to various provisions of the Commonwealth of Kentucky's election and campaign finance regulatory scheme. Plaintiffs Hobart Ward Anderson and Hoby for the Commonwealth (a write-in candidate for governor in 1999 and his campaign committee, respectively) bring what amounts to a tenfold assault on Kentucky's statutory scheme of electoral and campaign finance regulation. Specifically, plaintiffs challenge the following provisions: (1) KRS § 117.235(3) (prohibiting "electioneering" within 500 feet of polling stations),[1] (2) KRS § 121A.080(6) (requiring unexpended campaign funds to be turned over to the Commonwealth), (3) KRS § 121.150(16) (prohibiting post-election solicitation and acceptance of contributions), (4) KRS § 121A.050(2) (prohibiting cash contributions), (5) KRS §§ 121.150(13)-(20) (limiting loans of personal funds by a candidate to his or her campaign to $50,000), (6) KRS § 121.150(23) and KRS § 121A.030(5) (prohibiting solicitation and acceptance of contributions during the final twenty-eight (28) days before a general election), (7) KRS § 121A (Kentucky's public campaign finance scheme generally), (8) KRS § 121A.080(4)-(5) (permitting candidates receiving public financing to exceed the statutory contribution cap should other candidates themselves exceed the cap), and (9) KRS § 121A.010(11) (defining "contribution" to include donation of a candidate's own personal funds). Plaintiffs allege that these statutory provisions impermissibly burden the constitutional guarantees of free speech and association, offend due

---

**1.** Hereinafter, this provision is referred to as "the 500–foot electioneering ban," or simply "the electioneering ban."

Plaintiffs challenge two aspects of this provision. Plaintiffs' first argument addresses the length of the ban radius; plaintiffs' second argument addresses the propriety of the attorney general's classification of plaintiff Anderson's instruction cards (cards providing information to voters as to how properly to complete a write-in ballot) as "electioneering" and thus subject to the 500–foot ban. Because plaintiffs' brief addresses each provision separately and under a different "count", the Court preserves this organizational structure for the sake of clarity. Thus, though only nine individual statutes are involved, plaintiffs' dual challenge to KRS § 117.235 makes for ten (10) distinct and individual challenges.

process of law, and produce unconstitutional "takings." Plaintiffs' challenges are thus grounded in the First, Fifth, and Fourteenth Amendments of the United States Constitution.

This matter has been submitted on cross-motions for summary judgment. The parties concede that there exist no factual disputes, and that all issues presented are strictly question of law.[2] The legal issues fully briefed,[3] this matter is ripe for review.

## II. Analysis

### A. Board of Election Defendants—Counts I and II

Counts I and II of plaintiffs' motion for summary judgment address KRS § 117.235.[4] Plaintiffs challenge this statute both facially and as applied. Plaintiffs' challenge to KRS § 117.235 is two-fold: plaintiffs allege that this statute is overbroad or, in the alternative, void for vague-

ness. The allegation of overbreath amounts to a two-pronged charge that (1) the 500–foot electioneering ban is unconstitutionally expansive, or, in the alternative, (2) the statute, in addition to prohibiting "express advocacy," impermissibly prohibits "issue advocacy." Plaintiffs' vagueness averment is grounded in the assertion that the statute does not provide "fair notice" of the proscribed illegal conduct. Plaintiffs' alternative arguments are herein considered in turn.

#### 1. Overbreath

In claiming that KRS § 117.235 is unconstitutionally overbroad, plaintiffs advance two arguments. The first—and the only one with precedential justification—amounts to an assertion that the statute's ban on "electioneering" within 500 feet of polling places is, in terms of sheer length, far too expansive. Plaintiffs in this regard rely on the United States Supreme Court's

---

**2.** In their briefs, defendants attempt to raise (albeit half-heartedly) issues of both standing and ripeness. These arguments are without merit. As to standing, plaintiffs have evidenced actual injury caused by the challenged statutory provisions and redressable by a favorable ruling by this Court. Thus plaintiffs have met the tripartite requirements for standing. *See Grendell v. The Ohio Supreme Court,* 252 F.3d 828, 832 (6th Cir.2001). As for ripeness, passage of the 1999 gubernatorial election does not render this controversy unmaintainable, as the instant action qualifies under either the "collateral consequences" or "capable of repetition yet evading review" exception to the mootness doctrine. For a description of the "collateral consequences" exception, see *Sibron v. New York,* 392 U.S. 40, 53, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). For a description of the "capable of repetition yet evading review" exception, see *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**3.** It is helpful to note that defendants have submitted separate briefs. Counts I and II (the overbreath and vagueness challenges to KRS § 117.235, the 500–foot electioneering ban) are applicable to the Board of Elections

(the "Board defendants")—the state body charged with enforcing the 500–foot electioneering ban. Counts III–X are applicable to Kentucky's Registry of Election Finance (the "Registry defendants"), the state body charged with oversight of Kentucky's campaign finance provisions.

**4.** The challenged portion of KRS § 117.235 is subsection (3), which reads in part:

(3) No person shall ... do any electioneering at the polling place or within a distance of five hundred (500) feet of a county clerk's office or any entrance to a building in which a voting machine is located.... Electioneering shall include the displaying of signs, the distribution of campaign literature, cards, or handbills, the soliciting of signatures to any petition, or the solicitation of votes for or against any candidate or question on the ballot in any manner, but shall not include exit polling. Nothing contained in this section shall prohibit electioneering conducted within a private residence or establishment other than that in which the polling place is located by persons having an ownership interest in such property.

ruling in *Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), a decision strongly implying (but not specifying) the existence of some constitutional limitations on the length of such electioneering bans. Plaintiffs' second overbreath argument amounts to an assertion that, in addition to banning (permissibly) "express advocacy," the statute goes too far in banning "issue advocacy." This second argument is derived from the Supreme Court's holding in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), a decision involving not electioneering bans but campaign finance restrictions. In this sense plaintiffs' second argument appears wholly novel.

### a. The 500–foot electioneering ban

■ All agree that the constitutional question presented by Kentucky's 500–foot electioneering ban is controlled by the Supreme Court's ruling in *Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). There, in a highly-fractured opinion, a mere plurality of the Court upheld a Tennessee statute prohibiting solicitation of votes and display or distribution of campaign materials within 100 feet of polling stations.

In *Burson,* the Court began by noting that, as a content-based restriction on political speech in a public forum, [the Tennessee statute] would be subjected to "exacting" scrutiny. *Id.* at 197, 112 S.Ct. 1846. The Court went on to specify that this "exacting" scrutiny meant that Tennessee had to show that the regulation was "necessary to serve a compelling state interest and ... [was] narrowly drawn to achieve that end." *Id.* (quoting *Perry Ed. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. at 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Having set forth the proper standard of review, the Court acknowledged, however, that this standard—seemingly quite clear—was often quite difficult to apply. As the Court noted:

Despite the ritualistic ease with which we state this now-familiar standard, its announcement does not allow us to avoid the truly difficult issues involving the First Amendment. Perhaps foremost among these serious issues are cases that force us to reconcile our commitment to free speech with out commitment to other constitutional rights embodied in government proceedings .... [Cases involving "electioneering" bans] present[ ] us with a particularly difficult reconciliation: the accommodation of the right to engage in political discourse with the right to vote—a right at the heart of our democracy.

*Id.* at 198, 112 S.Ct. 1846 (citations omitted).

Having identified the appropriate legal standard (and having noted the difficulty of its application), the Court endeavored to apply this standard to the Tennessee statute before it. The Court first addressed the question whether Tennessee could, in fact, demonstrate that Tennessee's 100–foot restriction served any "compelling" interests. The Court found two: (1) protecting the right of citizens to vote freely for the candidates of their choice, and (2) protecting the right to vote in an election conducted with integrity and reliability. *Id.* These interests, the Court found, were "obviously" compelling. *Id.* at 199, 112 S.Ct. 1846.

The Court noted, however, that more was required then a mere demonstration of compelling interests. Indeed, a showing of "necessity" was also required. In the Court's words, "[t]o survive strict scrutiny ... a State must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Id.* The Court went on to examine the "necessity" of Tennessee's 100–foot ban, in the process rejecting the arguments that (1) the same interests could be served without so burdening First

Amendment freedoms by statutes directly regulating the prohibited conduct (i.e. making it illegal to interfere with an election, or to use violence or intimidation to prevent voting),[5] and (2) the statute was under-inclusive, in that it failed to ban *all* political speech (such as exit polling) within the ban radius. *Id.* at 206–08, 112 S.Ct. 1846. In the final analysis, the Court found that the question of necessity and narrow tailoring required examination of the "real question": "*How large a restricted zone is permissible or sufficiently tailored?*" *Id.* at 208, 112 S.Ct. 1846.

The Court, however, declined to answer its own question. Instead, the Court simply stated that "it is sufficient to say that in establishing a 100–foot boundary, Tennessee is on the constitutional side of the line." *Id.* at 210, 112 S.Ct. 1846. The Court indicated that, while it is true that "[a]t some measurable distance from the polls ... governmental regulation of vote solicitation could effectively become an impermissible burden," there exists no judicial magic formula or "litmus-paper test that will separate valid from invalid restrictions." *Id.* at 210–11, 112 S.Ct. 1846 (quotations and citations omitted).

It is in this context of imprecision that this Court in the instant action endeavors to pass upon the constitutionality of Kentucky's 500–foot electioneering ban. *Burson* makes clear that a state may constitutionally restrict election-day campaigning within 100 feet of polling stations. But what of a 500–foot restriction? This is the question of first impression presented by the instant action.

Given the absence of a "litmus-paper test"—or, for that matter, *any* test—this Court readily admits that its reasoning is

less than scientific. The Court perceives the question as such: given the constitutional compromise between free speech and fair elections struck in *Burson,* does the extension of the speech restriction from 100 to 500 feet upset the constitutional balance?

In considering the question, the Court first notes that Kentucky has asserted the very same interests recognized as "compelling" by the *Burson* plurality. There is, then, no question on this point. But what of "necessity?" Is the 500–foot ban "narrowly tailored?" The constitutionality of KRS § 117.235 would seem to turn on the answer to this question.

Upon careful consideration, the Court finds that Kentucky's ban on electioneering within 500 feet of polling stations *is*, in fact, both necessary and narrowly tailored. In coming to this conclusion, the Court places great weight on the demonstrated and undeniable past failure of a less restrictive ban, on the painstakingly deliberate and lengthy process by which the 500–foot ban came into existence, and on general principles of federalism and appropriate deference to legislative enactments.

Of these indicia of constitutional "necessity," the patent failure of Kentucky's original (and less-restrictive) ban is perhaps the best evidence of the necessity of the Commonwealth's present (and more expansive) 500–foot restriction. By all accounts, the former electioneering ban—limited to fifty (50) feet—had proven thoroughly ineffectual. The record is replete with testimony to this effect, and even plaintiffs do not dispute that something more was needed.

Further evidence of the necessity and narrow tailoring of the Commonwealth's

---

**5.** Plaintiffs in the instant action rely heavily on such arguments. But there is no merit therein. Wrote the *Burson* Court: "Intimidation and interference laws *fall far short* of serving a State's compelling interests because they 'deal with only the most blatant and specific attempts' to impede elections." *Id.* at 206–07, 112 S.Ct. 1846 (emphasis added) (quoting *Buckley v. Valeo,* 424 U.S. 1, 28, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)).

500–foot ban is found in the deliberative process by which the restriction came into existence. Close inspection reveals that the 500–foot radius length was agreed-upon only after careful study, discussion, and debate. In this respect the history of the 500–foot restriction is highly instructive.

Indeed, from the record it may be inferred that the Commonwealth's 500–foot ban is traceable to a 1987 series of articles published by the Louisville Courier–Journal detailing the full breath and scope of fraud and corruption in Kentucky's electoral system. From the record it appears that the Courier–Journal series gave rise to public outcry, from which arose a task force on election fraud assembled by then-Attorney General Fred Cowan and chaired by Louisville attorney Hiram Ely. The work of Attorney General Cowan's task force was supplemented by a special commission created by Kentucky's Legislative Research Commission. The Attorney General's task force and the Legislative Research Commission issued their first reports in January 1988.

Both reports arrived at the same conclusions. Generally, both the task force and the Legislative Research Commission reported rampant corruption in Kentucky's electoral system. Specifically, both reports found that such corruption was directly linked to electioneers' ability to ply their trade in close proximity to the polling stations. Both reports further found that the then-existing 50–foot ban was wholly inadequate in protecting voters from electioneers' improper influence and vote-solicitation. [Task Report, pp. 44–45; Special Commission First Interim Report at 19; Deposition of Hiram Ely, at 25].

Having studied the problem (corruption) and having identified the source (vote-buying), both the task force and the Special Commission went on to consider potential solutions. In this respect, both the Task Force and the Special Commission recommended that the 50–foot ban be expanded. The Task Force recommended a 1000–foot ban, the Special Commission a 500–foot ban. When representatives of both bodies subsequently met to formulate joint recommendations to present to Kentucky's general assembly, the parties elected to adopt the Task Force's 1000–foot ban. Ultimately, however, the 1000–foot ban was reduced in the course of the legislative process to a 500–foot restriction. The 500–foot electioneering ban became law when the Governor signed the Omnibus Election Reform Bill, of which the 500–foot electioneering ban was a part.

The Court notes the origin of KRS § 117.235 not to provide historical context, but rather to make clear the deliberate, considered manner by which the 500–foot ban came into existence. The situation presented by the instant action does not call for the Court to pass upon a constitutional free speech/fair election compromise hastily-arranged or reflexive—to the contrary, the history of Kentucky's 500–foot ban reveals it to be the product of both executive and legislative investigation, discussion, and debate. Simply put, the point is that the extensive scrutiny to which the restriction was naturally subject through the course of its enactment is further evidence of the provision's necessity and narrow tailoring.

Finally, the Court is mindful of established principles of federalism, and of the doctrine of separation of powers. While recognizing that "at some measurable distance ... [Kentucky's] regulation of vote solicitation could effectively become an impermissible burden," *Burson,* 504 U.S. at 210, 112 S.Ct. 1846, the Court believes that, as to the question of necessity, the legislature should be afforded at least a minimal degree of deference. *Burson* makes clear that a ban of *some* length may constitutionally exist; as the branch of

government closest to the populace, the legislature is in the best position to determine the precise coordinates. It is enough for this Court to find that the Commonwealth's 500–foot ban is necessary, and that the ban does not extend beyond *Burson's* constitutional "measurable distance." Whether 100, 200, or 300 feet—this is a question for the General Assembly, not this Court.

For the reasons outlined above, then, the Court finds the Commonwealth's 500–foot electioneering ban to be both necessary and narrowly tailored. Because the restriction is necessary and narrowly tailored, and because the ban serves recognized and compelling state interests, the restriction survives "strict scrutiny" review. In short, Kentucky's prohibition on electioneering within 500 feet of polling stations strikes a constitutionally permissible compromise between the competing interests of free speech and fair elections. Plaintiffs' challenge fails.[6]

### b. "Express" versus "Issue" Advocacy

■ Plaintiffs' second overbreath argument appears wholly novel. Specifically, plaintiffs rely on the seminal *campaign finance* decision *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), wherein the United States Supreme Court distinguished "express" and "issue" advocacy, finding that the former but not the latter could be regulated constitutionally. In effect, plaintiffs ask this Court to borrow the express/issue advocacy dichotomy from the campaign finance context and to apply it in this, the election-regulation (*Burson*-type) context. More specifically, plaintiffs' argument proceeds as follows: because under *Buckley* "issue" advocacy cannot be regulated, and because KRS § 117.235 makes no exception for "issue advocacy" (the provision prohibits *all* forms of electioneering within the 500–foot radius), the statute is overbroad and therefore unconstitutional.

As a matter of simple logic, the Court concedes a degree of intuitive appeal. Indeed, plaintiffs should be credited with unearthing the subtle tension between *Burson* (finding constitutional Tennessee's 100–foot campaign-free zone—a statutory restriction applicable to both "express" and "issue" advocacy) and *Buckley* (finding

---

**6.** In upholding KRS § 117.235, the Court declines to follow, to the (limited) extent that it is apposite, the holding of the Eastern District of Wisconsin in *Calchera v. Procarione*, 805 F.Supp. 716 (E.D.Wis.1992). There, the court struck down Wisconsin's own 500–foot electioneering ban. In finding Wisconsin's ban unconstitutional, the Eastern District deemed persuasive Justice Stevens's dissent in *Burson*, wherein Justice Stevens cites Wisconsin's and Kentucky's 500–foot bans as apparent paradigms of unconstitutionally overbroad restrictions. *Burson*, 504 U.S. at 218, 112 S.Ct. 1846 ("[I]n some States, such as Kentucky and Wisconsin, the radius of the restricted zone is 500 feet—silencing an area of over 750,000 square fee. Even under the most sanguine scenario of participatory democracy, it is difficult to imagine voter turnout so complete as to require [such an expansive ban].").

This Court finds *Calchera* unpersuasive (if not outright inapplicable) for two principal reasons. First, and most significantly, the Wisconsin statute—unlike its Kentucky analog at issue in the instant action—did not contain an exception for private property. In finding the Wisconsin statute overbroad, the *Calchera* court relied heavily on this aspect of the restriction, noting that the statute, "with its sweeping zone of protection, prohibit[ed] individual homeowners from expressing their political views *on their own property.*" *Calchera*, 805 F.Supp. at 720. In contrast to its legally-deceased Wisconsin counterpart, KRS § 117.235 specifically exempts private property. Second, unlike Kentucky in the instant action, Wisconsin in *Calchera* declined to defend the challenged ban.

"issue" advocacy in all instances not subject to constitutional regulation).

The fact remains, however, that the Court decided *Burson* some sixteen (16) years after *Buckley*. The *Burson* Court, then, either overlooked *Buckley* or, on the other hand, simply found it inapplicable. This Court finds that the former scenario is highly unlikely; *Buckley*, after all, is the seminal campaign finance decision. Rather, the logical inference is that the *Burson* Court, faced with an issue relating not to campaign finance, but rather to election regulation (specifically, the constitutionality of Tennessee's 100–foot restriction), found *Buckley* inapposite.

In other words, *Buckley's* express/issue advocacy terminology lacks currency outside the campaign finance context. To the knowledge of this Court, the express/issue advocacy distinction has never before been applied in the election regulation context. Though not without merit, the argument must fail on account of its nonexistent precedential foundation. For this reason and for the reasons outlined above, plaintiffs' argument that KRS § 117.235 is overbroad because it prohibits both "express" *and* "issue" advocacy is rejected.

### 2. Vagueness

■ The challenged provision is not vague. The Court finds as a matter of law that the definition of "electioneering" contained in KRS § 117.235(3) provides fair notice of what conduct is prohibited. That the statute contains a scienter requirement is additional evidence that the statute is not unconstitutionally vague.[7] *Hill v. Colorado*, 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Certainly it cannot be said that the statute is so vague or standardless as to rise to the level of a due

process violation. *See City of Chicago v. Morales*, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).

### B. Registry of Election Finance Defendants ("Registry Defendants")— Counts III—X

#### 1. Count III—Plaintiffs' Challenge to KRS § 121A.080(6) (Kentucky's so-called "turn-over" provision)

■ Plaintiffs challenge the Commonwealth's so-called "turn-over" provision, which requires campaign committees to transfer any unexpended funds to the Commonwealth's Registry of Election Finance. The challenged provision reads, in relevant part:

> A slate of candidates shall establish a separate candidate campaign account for each primary, runoff primary, and regular election in which it participates. The unexpended balance of contributions and fund transfers in a candidate campaign account of a slate of candidates which remains after all financial obligations of the particular election for which the account is established have been satisfied shall be forwarded to the registry for deposit in the fund when the account is closed.

KRS § 121A.080(6).

As both plaintiffs and defendants note, this provision is subject to two interpretations. One reading of the statute would find subsection six (6) applicable to *all* candidate slates, with no distinction made between slates receiving public funds (participating slates) and those not receiving such monies (non-participating slates). A second reading would find the subsection to apply to participating slates only.

---

**7.** KRS § 117.995(6) amounts to a notification provision. It provides that a person cannot be convicted of violating KRS § 117.235 unless the violation occurs "after [the person] has been duly notified of the provisions by any precinct election officer, county clerk, deputy county clerk, or other law enforcement official."

Plaintiffs argue that the plain meaning of the provision precludes a judicial construction that the statute is applicable to participating slates only. Accordingly, argue plaintiffs, in requiring candidate slates not receiving (or, in the cases of plaintiffs, ineligible for) public financing to "turn-over" unexpended funds to the Registry of Campaign Finance, the statute denies due process of law under the Fourteenth Amendment and constitutes an unconstitutional Fifth Amendment "taking." For their part, defendants acknowledge that, if read as applicable to both participating and non-participating candidates, KRS § 121A.080(6) "would create a host of constitutional problems." [Memorandum of Law in Support of Registry Defendants' Motion for Summary Judgment, Record No. 70, at 11].

Defendants, however, argue that the provision need not be construed so broadly. Defendants note the well-known canon of construction dictating that, when faced with two permissible statutory interpretations, a court should choose the interpretation that will save the statute. *Rust v. Sullivan*, 500 U.S. 173, 190–91, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Defendants ask the Court to employ this principle in the instant case to find the "turn-over" provision of KRS § 121A.080(6) applicable to participating candidate slates (those slates receiving public monies) only.

The Court finds defendants' argument persuasive and its proposed construction eminently reasonable, and holds that KRS § 121A.080(6) applies to participating candidate slates only. The turn-over provision does not apply to non-participating candidate slates (such as plaintiff). In upholding KRS § 121A.080(6), the Court notes that its conclusion is nothing more than a reiteration of this Court's holding in *Gable v. Jones*, No. 95–12 (E.D.Ky. January 5, 1996) (unpublished), a case which presented the very same issue as decided herein.

**2. Count IV—Plaintiff's Challenge to KRS § 121.150(16) (prohibiting the solicitation of contributions for election expenses after regular elections)**

In support of its ban on post-election contributions the Commonwealth asserts as its interest that of combating the appearance of quid pro quo corruption—an interest the *Buckley* Court explicitly recognized as compelling. The only question, then, is whether KRS § 121.150(16) may be deemed narrowly tailored.

As an initial matter, the Court notes that—though Kentucky's notorious history of pervasive corruption does not legitimize unbridled regulatory power—the depth and breath of the Commonwealth's history of electoral corruption should not be ignored altogether. Indeed, it might be said that, to a degree, the proper scope of the remedy can only be determined by considering the seriousness of the disease. In the end, however, this Court can do no better than to note the language of the Supreme Court of Alaska in *State v. Alaska Civil Liberties Union*, 978 P.2d 597 (1999), *cert. denied*, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000), a decision wherein the Alaska Supreme Court was presented with a similar post-election contribution ban. Said the court: "Post-election time limits ... far more clearly address corruption and its appearance because the election has resolved the critical contingency of which candidate will hold office. *We think this latter impact on associational rights is narrowly tailored to further compelling state interests.*" *Id.* at 630 (emphasis added).

It cannot be denied that post-election contributions present unique possibilities of corruption,[8] and are thus deserving of

---

**8.** Perhaps the foremost of these possibilities is

the opportunity to disguise contributors' iden-

special precautions. The Commonwealth's ban on post-election contributions is just such a precaution, and therefore the Court finds the restriction to be sufficiently narrowly tailored as to survive strict scrutiny.

### 3. Count V—Plaintiffs' Challenge to KRS § 121A.050(2) (prohibiting cash contributions)

▮ Plaintiffs' mount a facial and as-applied challenge to the Commonwealth's prohibition against cash contributions in gubernatorial elections. The statute amounts to a first-dollar reporting requirement. Plaintiffs allege that KRS § 121A.050(2) is a content-based restriction, and—as such—is subject to strict scrutiny.

As an initial matter, the Court does not agree with plaintiffs' designation of the appropriate standard of review. Quite simply, the Commonwealth's "no cash" prohibition has no bearing on *what* may be spoken; rather, the restriction is aimed at the *manner* of speech. In other words, the restriction appears not content-*based*,

but rather content-*neutral*. It would follow, then, that the appropriate review standard would be significantly more lax.

Yet it matters not. Even applying the stricter standard, the "no cash" prohibition is narrowly tailored and the Commonwealth's interest is unquestionably compelling.[9] In Kentucky, a state in which cash has proven the preferred currency of electoral corruption,[10] it would seem that prohibiting cash contributions is a virtual sine qua non of legitimate elections. Moreover, the provision is narrowly tailored. The statute does not sweep broadly; to the contrary, KRS § 121A.050(2) does no more than establish a linkage between gubernatorial campaign contributions and their sources.

In substance, then, KRS § 121A.050(2) amounts to a disclosure requirement, the constitutionality of which the United States Supreme Court has long recognized. *See Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Accordingly, the restriction is constitutional.

tities. As noted by a Florida court:

> [A special compelling interest] is the goal of allowing the public to be informed *before* an election of the identities of persons contributing to the campaign of a particular candidate.... [I]f post-election contributions were allowed, a candidate could make large expenditures, secure in the knowledge that immediately after the election members of some currently unpopular group whose support for the candidate had not theretofore been disclosed would send in contributions to pay off the deficit. The result, of course, would be that voters may have been deceived into voting for a candidate with allegiances, or at least bedfellows, with which they violently disagree.

*Ferre v. State of Florida*, 478 So.2d 1077, 1080 (Fla.Dist.Ct.App.1985), *aff'd and adopted*, 494 So.2d 214 (1986), *cert denied*, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987).

**9.** The Commonwealth cites three purported interests: (1) informing the electorate, (2) de-

terring corruption, and (3) enhancing detection. These interests are compelling and have been acknowledged as such. As for the question of narrow tailoring, the Commonwealth notes that disclosure requirements have been recognized as "the least restrictive means of curbing the evils of campaign ignorance and corruption." *Buckley v. Valeo*, 424 U.S. 1, 68, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

**10.** Although the record is replete with testimonials respecting Kentucky's infamous history of electoral corruption, a certain article appearing in the Courier–Journal on October 17, 1987 is particularly instructive. The article, entitled *"Illegal cash, and lots of it, fuels illegal political acts,"* is highly illustrative of the special role that cash has played in the facilitation of electoral mischief. The article, one in a series composing a comprehensive investigative report, suggests that the use of illicit cash dates back to Kentucky's first governor, Isaac Shelby, who took office in 1791. [Record No. 70, Exhib. 2].

### 4. Count VI—Plaintiffs' Challenge to KRS §§ 121.150(13) & 121.150(20) (prohibiting candidate loans in excess of $50,000)

■ Plaintiffs' challenge to the Commonwealth's $50,000 limitation on loans from a candidate to their campaign committees is founded on the assertion that there is no constitutionally-relevant difference between candidate expenditures (which cannot be limited) and loans from a candidate to their campaign committees. Plaintiffs argue that candidate expenditures and loans are "birds of the same feather," and that therefore under *Buckley* the Commonwealth cannot place limitations on either.

The Court disagrees. Candidate loans are most certainly *not* like candidate expenditures, and are in fact different in kind. They are animals not merely of a different breed, but of a different species altogether. The difference is this: fundamentally, loans from candidates to their committees—and, more specifically, the mechanics of repayment—present unique opportunities for corruption.

Plaintiffs, failing to grasp the distinction, ask the question:

> But it impossible [sic] to see if an appearance of corruption arises from contributions to repay a loan after an election why it does not also arise from contributors to pay for the campaign before the election. *Why is it worse for candidates to be held hostage by potential contributors so that their loans might be repaid than it is for candidates to be held hostage by potential contributors who might help candidates win their campaigns in the first place? Candidates are at least equally indebted to contributors to candidates' campaigns who contribute before-the-fact as they are to contributor [sic] who contribute after-the-fact.*

[Record No. 78, Plaintiffs' Memorandum in Opposition to Registry Defendants' Motion for Summary Judgment, p. 2–3] (emphasis added).

By way of response, the Court respectfully suggests that plaintiffs are either unaware of the Commonwealth's electoral history or simply naive as to the historical reality of campaign financing in Kentucky. The problem with candidate loans—and the reason candidate loans are different from candidate expenditures—is that loans require third party repayment, often after an election winner has been determined. The opportunity to contribute to an announced winner opens the door for contributors to contribute not for the constitutionally-protected right of "speaking", but rather for the decidedly-illegal purpose of quid pro quo corruption. Bluntly, plaintiffs' assumption that election winners are "equally indebted" to pre- and post-election contributors is erroneous. Post-election loan repayment—and loan repayment generally, as compared to candidate expenditures—is "worse" because of the unique possibilities of quid pro quo corruption.

It is this possibility of qui pro quo corruption (or the appearance thereof) that justifies the restriction on loans from candidates to their campaigns. *Buckley* itself made clear that preventing corruption or the appearance of corruption is a compelling state interest sufficient to justify restrictions on First Amendment rights.

As a final note, the Court notes that it finds persuasive Chief Judge Simpson's analysis in *Wilkinson v. Jones*, 876 F.Supp. 916 (W.D.Ky.1995), and adopts the reasoning applied therein. In *Wilkinson*, the Western District upheld the very sections challenged here (KRS §§ 121.150(13) & 121.150(20)). In upholding the $50,00 loan limit, Chief Judge Simpson identified two distinct compelling interests served by the $50,000 limitation. First, not unlike

the prohibition of post-election contributions contained in KRS § 121.150(16), the loan limitation serves to negate the "impression that [a] contributor is lining [a] candidate's pocket, as there is no ongoing campaign to which the contribution may be made." *Id.* at 930. Second,

> [t]he $50,000 loan limit removes the appearance that heavily indebted candidates are easy bedfellows for quid pro quo contributors. Because they may not make loans in excess of $50,000 to their own campaigns, they cease to be personally financially vulnerable and therefore do not appear to be easy targets for corrupt contributors.

*Id.* at 930–31.

In sum, the Commonwealth's $50,000 limitation on loans by candidates to their campaign committees serves compelling state interests. As well, the provision is narrowly tailored and acts in tandem with other provisions of the statutory scheme in guarding against corruption and the appearance thereof.

### 5. Count VII—Plaintiffs' Challenge to KRS §§ 121.150(23) and 121A.030(5) (prohibiting contributions during the final twenty-eight (28) days before a general election)

█ Plaintiffs' challenge KRS § 121.150(23) and 121A.030(5), which prohibit campaign contributions during the twenty-eight (28) days preceding a primary or general election. Although during this period candidates cannot receive contributions, they are permitted to spend any monies previously collected. The provision, then, is not a constitutionally-impermissible restriction on expenditures, but rather an allowable restriction on contributions.[11]

Plaintiffs' challenge to the 28–day window is virtually identical to a previous, unsuccessful challenge to the very same provision. In *Gable v. Patton,* 142 F.3d 940 (6th Cir.1998), the United States Court of Appeals for the Sixth Circuit addressed the very question presented here: whether the 28–day window could be applied constitutionally to candidates not participating in Kentucky's public-financing scheme.[12] The Sixth Circuit held that the 28–day window *could* be so applied.

Because the instant case presents the very same question decided in *Gable,* the Court is tempted simply to cite that case and move on. Plaintiffs, however, attempt to distinguish the *Gable* opinion by noting that, whereas in *Gable* the candidate *declined* participation in the public-financing scheme, in the instant case plaintiff (as a write-in candidate) was *not eligible* to participate. Although plaintiffs' point must be conceded, such is a classic case of a "distinction without a difference"—plaintiff, as a non-participating candidate, must himself concede that his case falls squarely within the ambit of *Gable*'s holding.

In *Gable,* the Sixth Circuit founded its conclusion on its recognition that the 28–day window was an indispensable and central provision of the public-financing scheme. The court correctly reasoned that, absent the window, the Commonwealth would not have sufficient time to calculate candidates' final contribution tallies for purposes of determining whether any non-participating candidates had ex-

---

11. More specifically, the provision is a restriction on *third-party* contributions. Plaintiffs themselves are permitted to contribute to their own campaigns even during the final twenty-eight (28) days. *See Gable v. Patton,* 142 F.3d 940 (6th Cir.1998), discussed *infra.*

12. There was, and remains, no dispute that the Commonwealth may impose the 28–day restriction on candidates voluntarily participating in the state's public financing scheme. *Buckley,* 424 U.S. at 57 n. 65, 96 S.Ct. 612.

ceeded the $1.8 million contribution ceiling. The Court noted that it is critical that such calculation be made before the date of election, so as to enable the Registry of Finance to determine whether participating candidates are themselves relieved of the $1.8 million contribution cap. The Court further recognized that this calculation must be made at a point in time before the election sufficient to provide participating parties a reasonable time to solicit additional contributions.[13] This is, after all, the very essence of the statutory scheme.

While noting the indispensability of the 28–day window, the Court did not fail to consider the opposite side of the constitutional equation. Specifically, the court recognized that the effect of the provision is to "rearrange [candidate] fundraising by concentrating it in the period before the 28–day window begins." *Id.* at 951. The Court acknowledged this effect as "not a trivial restriction" but went on to conclude that the court "read *Buckley* to say that such a restriction is justified by Kentucky's interest in combating corruption." *Id.* at 951.

The Court fails to see how *Gable* applies with less force in the instant action. It is true that, unlike in *Gable* (where plaintiff/candidate *chose* not to participate), plaintiff Anderson in the instant action was *ineligible* from the outset. But this distinction does not push the instant action outside the reach of *Gable's* holding, and the constitutional analysis presented therein is no less applicable here. Plaintiffs contend that "[t]he Kentucky financing scheme is not a house of cards that will fall if those banished from the house must no longer suffer the burden of sustaining it."

[Record No. 78, Plaintiffs' Memorandum in Opposition to Registry Defendants' Motion for Summary Judgment, at 8]. Plaintiffs argue further that "if write-in candidates who are categorically ineligible for the campaign finance scheme are no longer required to abide by the 28–day window, the scheme will continue to work for all those eligible to participate in it." *Id.* For all the reasons detailed above, this is simply not true. As recognized by the *Gable* court and as outlined above, the 28–day window is a pillar without which the Commonwealth's public-financing scheme cannot stand. The provision is valid under both *Buckley* and *Gable*.

### 6. Count VIII—Plaintiffs' Allegation that KRS Chapter 121A Violates the Equal Protection Clause of the Fourteenth Amendment

■ Plaintiffs mount a general challenge to chapter 121A, Kentucky's Public Financing Campaign Act. The thrust of plaintiffs objection is that, because Kentucky write-in candidates such as plaintiff are—as a class—categorically ineligible for public financing, write-in candidates such as plaintiff are denied equal protection of the law. Plaintiffs claim that the Commonwealth's apportionment of public financing in this way invidiously discriminates against write-in candidates.

As an initial matter, the Court notes that equal protection challenges to public-financing schemes are not novel. In fact, the equal protection issue was first addressed in *Buckley* itself. There, the Supreme Court established (among other things) the basic principle that "the Constitution does not require Congress to

---

**13.** The "trigger" provision is KRS § 121A.030(5)(a). The provision amounts to "a mechanism whereby, when a non-participating [candidate] collects more than $1.8 million in campaign funds in a primary or general election, the $1.8 million ceiling is lifted for participating [candidates], and the 28–day window is lifted for all [candidates]." *Gable v. Patton*, 142 F.3d 940, 947 (6th Cir. 1998).

treat all declared candidates the same for public financing purposes." *Buckley v. Valeo*, 424 U.S. at 94–95, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In this foray into the murky world of public-financing systems, this basic precept provides a clearly-demarcated and invaluable point-of-reference. Ultimately, is it this basic principle that guides the holding of this Court.

*Buckley's* plain language requires that this Court dismiss plaintiffs challenge. There, the Supreme Court unequivocally stated that *"the limited participation or nonparticipation of nonmajor parties or candidates in public funding does not unconstitutionally disadvantage them."* *Buckley v. Valeo*, 424 U.S. 1, 101, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (emphasis added). In arriving at its conclusion, that Court noted that public-financing is "only one method of obtaining pre-election financing.... Plainly, campaigns can be successfully carried out by means other than public financing; they have been [up to that time]." *Id.* at 101–02, 96 S.Ct. 612.[14]

In upholding the Commonwealth's categorical exclusion of write-in candidates from public-funding eligibility, this Court is not unmindful that the instant action presents a significant twist on the *Buckley* equal protection analysis, a distinction that may, indeed, be said to inch the Commonwealth's scheme in the direction of invidious discrimination. Specifically, it must be noted that the *Buckley* Court justified the constitutionality of public-funding in part by emphasizing that, in conditioning public funding on acceptance of expenditure limits, the scheme at issue there imposed countervailing "burdens" on publicly-financed candidates. *Buckley*, 424 U.S. at 95 n. 129, 96 S.Ct. 612. The Supreme Court noted that, in this respect, public-financing schemes may actually *improve* the chances of candidates not receiving public funding. *Id.* By stark contrast, however, the Commonwealth's scheme—by virtue of its "trigger provision"—in effect contains no such limitations. Under Kentucky's scheme, though it is true that participating candidates are initially barred from receiving contributions or making expenditures in excess of $1.8 million, *this limitation is lifted* if any non-participating candidate receives or expends more than the $1.8 million cap. KRS § 121A.030(5). Unlike as in the *Buckley* context, then, the Commonwealth's scheme does not provide this countervailing "burden".

This is not an insignificant distinction. In the final analysis, however, the Court finds that this is not enough to pull the Commonwealth's scheme out from the constitutional umbrella of *Buckley*. Plaintiffs' equal protection challenge fails.

### 7. Count IX—Plaintiffs' Allegation that Kentucky's Financing Scheme Effectively Limits Plaintiffs' Expenditures to the Limits Imposed on Participating Candidates

█ Plaintiffs challenge Kentucky's "trigger" provision, KRS § 121A.080(4)—(5), the centerpiece of Kentucky's public-financing scheme, on the ground that the Commonwealth's $1.8 million contribution/expenditure cap does not merely provide incentive for participation in the public-financing scheme but in facts amounts to unconstitutional coercion. Though the

---

**14.** A later court summarized *Buckley's* holding on this point in more dramatic fashion. Wrote the United States District Court for the District of Rhode Island: "The *Buckley* Court rejected an equal protection challenge to the presidential campaign funding scheme brought by minor party candidates who not only were disadvantaged as compared to publicly funded major party opponents, but who were denied participation in the scheme altogether." *Vote Choice, Inc. v. Di Stefano*, 814 F.Supp. 195, 206 (D.R.I.1993).

Sixth Circuit in *Gable v. Patton*, 142 F.3d 940, 947–49 (6th Cir.1998), squarely dismissed this argument in the context of a facial challenge to the provision, plaintiffs in the instant action attempt to circumvent the Sixth Circuit's holding by challenging the statute as-applied.

Here too, however, plaintiffs distinguish *Gable* by noting that, whereas there the candidate *elected* to forego public funding, here candidate Anderson (as a write-in candidate) *was categorically ineligible*. Again, the Court concedes the distinction.

Yet it matters not. As recognized by the *Gable* court, Kentucky's trigger provision is an acceptable incentive to participate in the Commonwealth's public-financing scheme, and to adhere to corruption-preventing contribution and expenditure limitations imposed thereby. The Court does not perceive the fact of plaintiff Anderson's ineligibility to change the constitutional landscape whatsoever: whether non-participating by choice or on account of ineligibility, non-participating candidates are in both instances presented with a "strategic choice" [15] to accept or reject the scheme's $1.8 million expenditure/contribution limitation. The constitutionality of this "strategic decision" was upheld in *Gable* and is unaffected by the fact of plaintiffs' ineligibility for public funding. As such, Kentucky's trigger provision is constitutional not only on its face but as applied to plaintiffs as well.

## 8. Count X—Plaintiffs' Allegation that the Commonwealth's Public Financing Scheme In Effect Unconstitutionally Limits Plaintiff Anderson's Expenditures

Plaintiffs' final count addresses the scheme's definition of "contribution," found in KRS § 121A.010(11). Specifically, plaintiffs allege that the scheme's inclusion of candidates' personal expenditures as "contributions" (for purposes of activating the trigger provision) amounts to a constitutionally-significant "disadvantage" to non-participating candidates such as plaintiff Anderson. In support of their contention—a contention that in substance does not materially differ from plaintiffs' general objection to the scheme's trigger provision—plaintiffs argue that the scheme's inclusion of candidate expenditures in the definition of "contribution" serves only to exacerbate the problems presented by the existence of the trigger.

Plaintiffs' argument is wholly without merit. Fundamentally, it does not follow that simply because the Commonwealth has elected to treat contributions by candidates to their own campaigns as "contributions" for purposes of counting toward activation of the trigger that therefore candidates are in any way limited in terms of the amount they may contribute. Defining "contribution" to include candidate contributions to their own campaigns sim-

---

**15.** The term is Chief Judge Simpson's. Wrote the Chief Judge, regarding the tactical choice facing non-participating candidates:

> Under the Kentucky statute the determination whether to exceed $1.8 million and thus trigger the release of the opposition is a calculated *strategic decision* to be made by the privately-financed candidate. This decision must be made in the context of his campaign plan and only after $1.8 million in speech on the issue has already taken place. As the privately-financed candidate nears the $1.8 million mark, there would have already been a significant amount of unconstrained speech on the issues. As noted in *Republican National Committee*, "Not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid." This court is not convinced that 121A.030(5)(a) [the "trigger" provision] impermissibly chills the speech of privately-financed candidates simply because it enables the speakers' adversaries to respond. It occurs to this court that the trigger provision promotes more speech, not less.

*Wilkinson v. Jones,* 876 F.Supp. 916, 926–27 (1995).

ply does nothing to alter the basic rule of *Buckley* that a candidate may not be limited in the amount of money he may himself expend to advance his campaign. In the instant case, for example, counting plaintiff Anderson's contributions to his own campaign as "contributions" for purposes of the scheme's trigger does not amount to a cap or ceiling on plaintiff Anderson's allowable expenditures; were he to have the inclination and resource, plaintiff Anderson is free to expend billions.

In substance, defining "contribution" as such does no more than offer participating candidates an opportunity to exceed the statutorily-imposed contribution/expenditure limitation should non-participating candidates do so themselves. It provides a fair method of calculation. Perceived from this angle, the scheme's inclusion of candidate expenditures in the definition of "contributions" is no more than an essential incentive provision without which candidates would be far more wary of participating in the Commonwealth's public-financing scheme. Were candidate contributions not counted toward activation of the trigger, non-participating candidates could safely contribute unlimited sums of their own funds without relieving participating candidates of the imposition of the $1.8 million limit. Such a scenario would render participation in the Commonwealth's public-financing scheme very risk business. Viewed this way, it is quite clear that the scheme's inclusion of candidate contributions in the definition of "contribution" is tantamount to an essential and constitutionally valid incentive provision.

### III.  Conclusion

This action amounts to an omnibus challenge to central provisions of Kentucky's election laws and public-financing scheme. For the reasons outlined above, the Court does not perceive any constitutional infrac-

tions. The Court rejects plaintiffs' challenge in all respects.

Accordingly,

**IT IS HEREBY ORDERED**

(1) That plaintiffs' motion for summary judgment [Record No. 69] be, and the same hereby is, **DENIED;** and

(2) That defendants' motion for summary judgment [Record Nos. 70 & 71] be, and the same hereby are, **GRANTED.**