[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13211

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 30, 2010
JOHN LEY
CLERK

D. C. Docket No. 4:10-cv-00283-RH-WCS

RICHARD L. SCOTT,

Plaintiff-Appellant,

versus

DAWN K. ROBERTS,
In Her Official Capacity as Interim Secretary
of State of the State of Florida,

Defendant-Appellee,

IRA WILLIAM McCOLLUM, JR.,

Intervenor-Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(July 30, 2010)

Before DUBINA, Chief Judge, PRYOR and MARTIN, Circuit Judges.

PRYOR, Circuit Judge:

In this emergency appeal from the denial of a motion for a preliminary injunction, Richard Scott, who is a candidate for the Republican Party for Governor of the State of Florida, asks that we preliminarily enjoin the enforcement of a provision of the Florida Election Campaign Financing Act that he contends violates his rights, under the First and Fourteenth Amendments, to spend unlimited sums of his personal funds and private donations to his campaign in furtherance of his candidacy. To date, Scott, who has never run for public office and is largely self-funding his campaign, has spent more than $21 million in the Republican primary to defeat his main opponent, Bill McCollum, the current Attorney General of Florida, who is participating in the public campaign financing system of Florida, which provides participating candidates with matching public funds to spend on their campaigns. That system also provides participating candidates like McCollum with a subsidy when a nonparticipating opponent spends in excess of $2 for each registered Florida voter, which for this election means almost $25 million. Fla. Stat. §§ 106.34, 106.355.

On July 7, as his campaign expenditures were rapidly approaching the $25 million threshold, Scott filed a complaint in the district court and asked the court to enjoin preliminarily the operation of the excess spending subsidy. Scott argued

2

that, under <u>Davis v. Federal Election Commission</u>, 554 U.S. - - , 128 S. Ct. 2759 (2008), the excess spending subsidy severely burdened his First Amendment rights and was not justified by a compelling state interest. The Interim Secretary of State, as the defendant in her official capacity, and McCollum, as an intervenor in his individual capacity, defended the excess spending subsidy.

The district court promptly convened a hearing for Scott's motion, carefully weighed the competing arguments, and agreed with the first part of Scott's complaint, but the district court concluded that the excess spending subsidy indirectly furthered the interest of Florida in preventing actual or apparent corruption by encouraging participation in the Florida public campaign financing system and was narrowly tailored to serve that end. We agree with the district court that <u>Davis</u> requires Florida to justify its excess spending subsidy by reference to the anticorruption interest, but conclude that Florida cannot satisfy its burden of establishing that its subsidy furthers that interest in the least restrictive manner possible. We reverse the judgment of the district court and preliminarily enjoin the Secretary of State of Florida from releasing funds to McCollum under the excess spending provision.

## I. BACKGROUND

To explain the background of this appeal, we first address the campaign for

the Republican nomination for governor of Florida. We then discuss the Florida campaign finance laws. Finally, we discuss the procedural history of this appeal.

*A. The 2010 Campaign for the Republican Nomination for Governor of Florida*

Richard Scott is a candidate for Governor of the State of Florida and is currently seeking the nomination of the Republican Party for that office. Despite having never held or campaigned for public office, Scott announced his candidacy for governor in April 2010. Scott is wealthy and describes himself as a former "health care executive and businessman." Last year, he founded an organization, Conservatives for Patients' Rights, to "promote free market principles in health care reform." Regarding his candidacy, Scott states that he is "running as a conservative outsider who is a successful businessman with the experience to create jobs, hold government accountable, and turn the state around."

Scott's main opponent in the Republican primary is Ira William ("Bill") McCollum Jr., the current Attorney General of Florida. Mike McCalister is the other candidate for the Republican nomination, is not a party to this appeal, and is described in the record as a nominal candidate. Unlike Scott, McCollum has a long history in Florida politics. Before the voters of Florida elected McCollum attorney general in 2006, McCollum had served for nearly 20 years as a Member of Congress from Florida. McCollum had also twice campaigned unsuccessfully as a

candidate for United States Senator from Florida. By his own admission, McCollum has substantial "experience running a campaign for statewide office in Florida." Consequently, he also has "substantial experience in raising the funds necessary to finance . . . a political campaign in a state such as Florida in which the election law limits the amount that individuals can contribute to a candidate." McCollum is also familiar with the Florida Election Campaign Financing Act, and he "consider[ed] the benefits of the Act, as well as the restrictions placed on a candidate by the Act," when he decided to participate in the Florida public campaign financing system.

McCollum elected to participate in the Florida system of public campaign financing, but Scott did not. Scott contends that he "believe[s] it is unfair to ask the taxpayers of Florida to subsidize the campaigns of politicians, especially in these difficult economic times." Rather than rely on public financing, Scott has decided to fund his campaign "substantially" with his own money.

Scott has funded a substantial campaign. According to Scott, he has compensated for his "relatively late entry into the race" and the fact that his principal opponent is "a politician who has been a fixture in Florida politics since 1980" by spending, between April 9 and July 7 of this year, approximately $21 million in support of his candidacy. Scott maintains that he has spent this money

5

on televison, radio, and mail advertising; travel; and "other voter education efforts." He explains that these expenditures have permitted him to "introduce [him]self to Florida voters, convey [his] political positions, and articulate [his] policy differences with Mr. McCollum and other gubernatorial candidates in a relatively short period of time."

Not surprisingly, these large expenditures, in Scott's words, "have proven to be extremely successful" in assisting his candidacy. According to a poll of likely voters in the Republican primary conducted by Quinnipiac University, on June 10, 2010, Scott led McCollum 44 percent to 31 percent. But opinion polls of random selections of voters are snapshots with margins of error, and campaigns are, to say the least, dynamic projects.

After McCollum's campaign manager, Jack Williams, "observed Mr. Scott's extensive radio and television campaign advertising throughout Florida," the McCollum campaign responded to Scott's expenditures by altering its advertising strategy. The McCollum campaign purchased advertising "many weeks before originally planned." According to Williams, McCollum spent $1 million on radio and television advertising through May 2010 and another $2.2 million through July 10, 2010. As of July 10, McCollum had $800,000 left to spend on his campaign, but McCollum is still scheduled to receive (if he has not already received) upwards

6

of $2 million in public funds to match private qualified contributions he has raised.

Notwithstanding the apparent success of his expenditures, Scott alleges he has recently curtailed his campaign spending to avoid triggering a public subsidy afforded to his opponent under the public financing system. The Florida public financing system provides a subsidy to a participating candidate when an opposing candidate who has chosen not to participate in public financing exceeds the statutory expenditure limit, which for this election is $24,901,170, or $2 for each registered voter. Fla. Stat. §§ 106.34, 106.355. Under the public financing system, if Scott spends over this amount, any participating opponent in the Republican primary for the nomination of governor is entitled to one public dollar for every dollar Scott spends over the limit. Id. § 106.355.

In his declaration, Scott alleged that, as he has approached this limit, he has reduced his campaign spending "in a drastic manner" to ensure that he is enabling McCollum's campaign for as few days as possible. He stated that from June 25 to July 2, he "cut by roughly half" the total amount of television time purchased for certain advertisements and limited the markets in which he ran those ads. Scott alleged that he halted all television and radio advertisements from July 3 to July 6. Scott asserted that he also cut by 40 percent the total amount of television time that he purchased for certain advertisements from July 7 to July 13. Scott stated that he

7

relied more on advertising purchased by a section 527 organization that he controls because the spending of that section 527 organization does not count as a campaign expenditure. The advertising purchased by the section 527 organization could not by law directly advocate Scott's election and was more expensive than advertisements that Scott could have purchased through his campaign because campaigns receive a discount under Florida law. Scott also alleged that he had reduced campaign travel for the two weeks preceding July 7. Scott also stated that he reduced spending on his absentee ballot program from approximately $1 million to $500,000. Scott asserted that he reduced voter-contact mail; limited staff hiring; reduced the use of paid callers to contact potential voters; and curtailed fundraising efforts.

Despite these reductions, Scott estimates that he will exceed the expenditure threshold "well before" the Republican primary on August 24. Scott does not expect that his reluctance to spend money on his campaign will abate when he exceeds that threshold. After he exceeds the threshold, Scott will "engage in less campaign speech than would be the case if [his] opponents were not eligible to receive subsidies under section 106.355." Scott explains that he has a constitutional right to avoid providing his opponents "with a competitive advantage and in turn permitting them to counteract and diminish [his] campaign

8

speech."

*B. The Florida Laws Regarding the Financing of Election Campaigns*

Florida laws regulate campaign financing for all candidates, political committees, committees of continuous existence, electioneering communication organizations, and political parties. Id. §§ 106.011–106.36. A candidate may not accept a contribution in excess of $500 from any person, political committee, or committee of continuous existence during an election. Id. § 106.08(1)(a). The statute defines a "person" as "an individual or a corporation, association, firm, partnership, joint venture, joint stock company, club, organization, estate, trust, business trust, syndicate, or other combination of individuals having collective capacity." Id. § 106.011(8). For the purpose of contribution limits, the statute considers primary and general elections separate elections for all opposed candidates. Id. § 106.08(1)(c). By law, a candidate for statewide office may not accept contributions that exceed $250,000 in the aggregate from national, state, or county executive committees of a political party. Id. § 106.08(2)(b). Florida law does not limit the amount that a candidate may contribute personally to his campaign. Id. § 106.08(1)(b)(1). All candidates must file regular reports of all contributions received and all expenditures made by or on behalf of such candidate with the Division of Elections. Id. §§ 106.07, 106.075.

Florida law does not consider "an expenditure made for, or in furtherance of, an electioneering communication . . . a contribution to or on behalf of any candidate." Id. § 106.011(18)(c). An electioneering communication is defined as any communication that is publically distributed by television, radio, satellite, newspaper, magazine, direct mail, or telephone, and that "clearly identifie[s] [a] candidate for office without expressly advocating the election or defeat of a candidate." Id. § 106.011(18)(a). The parties understand Florida law to permit a candidate to further his campaign by coordinating electioneering expenditures with organizations commonly known as section 527 organizations, which draw their name from the Internal Revenue Code that grants them tax-exempt status. See I.R.C. § 527. Section 527 of the Internal Revenue Code provides that an organization "operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures" need not declare contributions, dues or fundraising proceeds as income if the money is used for "the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office." Id. § 527(c), (e). Unlike political action committees that directly advocate for the election or defeat of a candidate, most section 527 organizations indirectly support a candidate by electioneering communications and thus avoid regular disclosure of

10

expenditures and contributions to the Federal Elections Commission. See id. § 527(j).

In 2005, the Florida Division of Elections interpreted Florida law to mean that expenditures of section 527 organizations that were coordinated with candidates did not constitute contributions to those candidates. Electioneering Communications, DE 05-04 (Fla. Div. of Elections June 28, 2005). The Secretary informed the district court that electioneering expenditures also do not constitute candidate expenditures. A recent federal court decision that invalidated the provision of Florida election law upon which that interpretation is based calls into question whether this coordination remains legal. See Broward Coal. of Condo., Homeowners Ass'n & Cmty. Orgs. Inc. v. Browning, No.4:08-cv-445-SMP (N.D. Fla May 22, 2009). Regardless, the parties agree that candidates continue to coordinate with section 527 organizations.

In 1986, the Florida Legislature passed the Florida Election Campaign Financing Act, 1986 Fla. Sess. Law Serv. ch. 86-276 (codified at Fla. Stat. §§ 106.30–106.36). The Act establishes a system that provides matching public funds to candidates for state political offices who agree to certain conditions. To be eligible to participate in the system, a gubernatorial candidate must submit an application for matching funds, Fla. Admin. Code Ann. r. 1S-2.047(1); be an

11

opposed candidate, Fla. Stat. § 106.33; agree to abide by an expenditure limit, which for the 2010 election is $24,901,170, id. § 106.34; raise an initial $150,000 in qualified contributions from Florida residents before receiving any public funds, id. § 106.33(2)(a)(1); agree to limit loans or contributions from his personal funds to $25,000, id. §106.33(3); limit contributions from national, state, and county executive committees of a political party to $250,000 in the aggregate (this limit applies to all candidates participating or not), id.; submit disclosure and reporting statements of each qualified contribution, id. § 106.35(3)(a); and submit a post-election audit of the campaign account, id. § 106.33(4). The Secretary represented to the district court that a participating candidate, like a nonparticipating candidate, remains free to coordinate electioneering expenditures with section 527 organizations, and these expenditures do not count toward the participating candidate's expenditure limit. See id. § 106.011(18)(c).

After the Division of Elections for the State of Florida certifies a candidate as eligible to participate in the system, the candidate is entitled to receive matching funds for certain qualifying contributions. Id. § 106.35. Participating candidates remain subject to the $500 cap on campaign contributions from persons or committees, id. § 106.08(1)(a), but become eligible as participants in the public financing system to receive matching state funds, up to $250, for each contribution

12

made by a Florida resident after September 1 of the calendar year before the election, id. § 106.35(2)(b). The state matches only $250 for aggregate contributions from an individual that exceed $250. For each dollar of a qualifying contribution that makes up all or part of the initial $150,000 in contributions a gubernatorial candidate must initially raise, the state provides the participating candidate $2 in public funds. Id. § 106.35(2)(a)(1). After the participating candidate raises the initial $150,000 in contributions, the state matches qualifying contributions dollar for dollar. Id. § 106.35(2)(a)(2).

In 1991, the Florida Legislature adopted section 106.355, which includes the excess spending subsidy that is the focus of this appeal. Section 106.355 provides a subsidy to a participating candidate when an opposing candidate who does not participate in public financing exceeds the statutory expenditure limit, which for this election is $24,901,170. 1991 Fla. Sess. Law Serv. ch. 91-107 § 24 (codified at Fla. Stat. § 106.355). Unlike the public funds that a participating candidate receives from the state that match private contributions to that candidate, the excess spending subsidy is tied to the spending of the participating candidate's opponent; Florida provides the participating candidate a dollar for every dollar his nonparticipating opponent expends above the statutory expenditure limit. Fla. Stat. § 106.355. This dollar-for-dollar subsidy is not a matching fund because the

13

participating candidate receives the subsidy regardless of any effort that he makes to raise funds for his campaign. See id. ("[These] funds shall not be considered matching funds."). This section also provides that a participating candidate is released from the expenditure limit to the extent that his nonparticipating opponent exceeds the limit. Id. Participating candidates remain eligible for matching funds up to the statutory expenditure limit for qualified private contributions and are released from a penalty that would require reimbursement of funds for contributions that exceed the expenditure limit. Id. Additionally, in enacting this subsidy, the legislature declared that "[i]f any provision of the [1991 A]ct, or the application thereof . . . is held invalid, the invalidity shall not affect other provisions . . . of the [A]ct which can be given effect without the invalid provision." 1991 Fla. Sess. Law Serv. ch. 91-107 § 36.

The Florida Legislature declared that it created the public financing system out of concern that the cost of running "an effective campaign for statewide office . . . discourage[s] persons from becoming candidates" and "limit[s] the persons who run for such office to those who are independently wealthy," or those who are supported by political committees or special interest groups that are capable of generating substantial contributions. Fla. Stat. § 106.31. According to the enabling statute, "the purpose of public campaign financing is to make candidates

14

more responsive to the voters of the State of Florida and as insulated as possible from special interest groups," and to dispel "the misperception [that] government officials [are] unduly influenced by those special interests to the detriment of the public interest." Id. That statute also provides that the public campaign financing system is intended to "encourage qualified persons to seek statewide elective office who would not, or could not otherwise do so and to protect the effective competition by a candidate who uses public funding." Id. The legislature declared its "interest in strengthening the integrity of, and public confidence in, the electoral process." 1991 Fla. Sess. Law Serv. ch. 91-107, pmbl.

*C. Procedural History*

On July 7, after Scott decided that his expenditures would trigger the public subsidy, Scott filed a complaint against Dawn Roberts, the Interim Secretary of State of Florida. Scott asked the district court to declare unconstitutional the provision of section 106.355 that creates the excess spending subsidy and to enjoin the Secretary from enforcing it. Scott's complaint asserted two counts: count one alleged that the excess spending subsidy "chills free speech by imposing a substantial burden on Mr. Scott's well-established right to spend his own funds in support of his own candidacy" in violation of the First and Fourteenth Amendments; and count two alleged that the excess spending subsidy "treats

15

candidates differently with respect to campaign expenditures based solely on whether the candidate has elected to participate in the public financing system." According to count two of the complaint, the excess spending subsidy requires Florida to subsidize the campaign of a participant, but not of a nonparticipant, after a nonparticipant exceeds the expenditure threshold, in violation of the Equal Protection Clause of the Fourteenth Amendment. Scott did not pursue count two in the district court and has not pursued it in this appeal.

Also on July 7, Scott moved the district court for a preliminary injunction and requested a hearing on his motion by July 16. In a memorandum of law that he filed with his motion, Scott argued that the decision of the Supreme Court of the United States on June 8, 2010, to stay the mandate in an appeal from the United States Court of Appeals for the Ninth Circuit, which involved a materially similar subsidy provision, and to lift the stay that the district court had entered after enjoining the provision, suggested that he was likely entitled to preliminary relief. See McComish v. Bennett, - - S. Ct. - -, No. 09A1163 (June 8, 2010); see also McComish v. Bennett, - - F.3d - - , Nos. 10-15165, 10-15166, slip op. 9139 (9th Cir. June 23, 2010); McComish v. Brewer, No. CV-08-1550-PHX-ROS (D. Ariz. Jan. 20, 2010). Scott also argued that the harm caused by the excess spending subsidy to his constitutional rights had become "ongoing and irreparable."

On July 14, the district court held a hearing about Scott's motion for a preliminary injunction. Scott, the Secretary, and McCollum, whom the district court permitted to intervene under Federal Rule of Civil Procedure 24(b), participated in the hearing, and the district court permitted each side about one hour to make arguments.

The record before the district court consisted of five affidavits and the parties' briefs. Scott and McCollum submitted affidavits consistent with the facts above. Jack Williams, McCollum's campaign manager, submitted an affidavit opposing the motion for a preliminary injunction that is consistent with the facts above. Stephen Hazelton, the president and director of a media placement company, submitted an affidavit on behalf of McCollum's memorandum in opposition that explains, in his opinion, the costs associated with television advertisements in Florida and the importance of establishing a strategic media plan early in a campaign. Sarah Bradshaw, the Assistant Director of the Florida Division of Elections, who is responsible for overseeing the Florida public financing system, submitted an affidavit that explains the system and verifies the applicable expenditure limit.

Before the district court, Scott argued that the First and Fourteenth Amendments guarantee him the right to "spend unlimited amounts" of his personal

17

funds to support his campaign and guarantee his campaign the right to spend an unlimited amount to secure his election. See Buckley v. Valeo, 424 U.S. 1, 55–59, 96 S. Ct. 612, 652–54 (1976). He argued, based on Davis v. Federal Election Commission, 128 S. Ct. 2759, that the excess spending subsidy severely burdened his exercise of that First Amendment right and was thus subject to strict scrutiny, which it could not survive. Scott did not contest that Florida could release McCollum from the expenditure limit affecting participating candidates after Scott exceeded that spending limit. Scott urged the district court to grant a preliminary injunction because he was likely to prevail later on the merits, the injury he was experiencing and would be experiencing is irreparable, and the equities and public interest do not counsel against relief.

The Secretary and McCollum responded that Scott's claims were unlikely to succeed on the merits because the subsidy did not burden Scott's speech rights. They argued that the subsidy only permitted Scott's opponents to speak. They asserted that any burden was justified by the interest of the state in "preventing corruption and the appearance of corruption as well as encouraging participation in the public campaign financing system as a means of preventing corruption." They argued that Davis is inapposite because the Florida system for public financing of campaigns does not at any point impose asymmetrical contribution limits on

18

participating and nonparticipating candidates. Finally, they urged the district court not to grant preliminary relief because Scott was unlikely to prevail later on the merits and had unnecessarily delayed filing suit. Moreover, they argued that it would be inequitable to force McCollum to rearrange his campaign strategy, which anticipated the subsidy, and deprive the public of two powerful and competing voices during the final weeks of the campaign.

After hearing from the parties, the district court stated, on the record, its thorough findings of "the facts that deal with these candidates and this election." The district court found that McCollum had opted to participate in the public financing system, would receive public funds based upon his qualifying contributions, and was not going to exceed the expenditure cap governing participating candidates. The district court also found that Scott had opted not to participate and that he would exceed the expenditure threshold and entitle McCollum to receive excess spending subsidies. The district court also found that McCollum would have participated in the public funding system and raised as much money as he had even if there had been no provision for an excess spending subsidy. It found that McCollum "probably would have spent the same amount he has spent, or very nearly the same amount that he has spent, with or without" a provision for an excess spending subsidy. McCollum "probably spent mostly in

19

response to Mr. Scott's expenditures, and not so much in reliance on the availability of [a subsidy] later on." The district court also found that McCollum could not reasonably have planned his campaign in reliance on the subsidy because the issue of its legality "was out there, and it has been out there . . . and will be after today."

The district court found that Scott would have "done just as he has done with or without" the excess spending subsidy. The district court explained that there is "no reason to conclude that [Scott] has changed his behavior up to this point for fear that the [subsidy] would be triggered," but the district court found that the excess spending subsidy "will make a substantial difference going forward. If [the excess spending subsidy] remains in place, Mr. Scott probably will reduce his direct spending, either because he does not want to make funds available to Mr. McCollum, or because Mr. Scott will be able to get his message out through 527s, or in some indirect way." The district court stated that, if "that happens, voters will hear only indirectly rather than directly from Mr. Scott, which, of course, is a First Amendment issue."

The district court denied Scott's motion for a preliminary injunction. The district court concluded that Scott had established irreparable harm and that the equities and the public interest did not clearly favor one side over the other. For

20

this reason, the district court stated that, if Scott were likely to prevail on the merits, it would grant preliminary relief. With regard to the merits, the district court concluded that the subsidy provision was probably constitutional. The district court agreed with Scott that, under Davis, the subsidy provision imposed a substantial burden on Scott's right to free speech and could be justified only by a compelling government interest. According to the district court, "The provision at issue [in Davis] raised the cap for the opponent, so that the opponent could go out and raise money and possibly spend it against the candidate. Here, it's not just a potential dollar. It's a certain dollar." The district court recognized that whether the excess spending subsidy was narrowly tailored to the anticorruption interest was a "very close issue" and it offered, under considerable time pressures, its "best analysis of the law as it stands."

The district court concluded that Florida had a compelling interest in preventing actual and apparent corruption that justified the excess spending subsidy. It adopted a theory that neither party had suggested and that the district court conceded had no basis in the statutory language or the legislative history. According to the district court, the legislature adopted a $500 contribution limit applicable to all candidates to combat corruption or the appearance of corruption. "But the legislature may not have wanted to hamstring a candidate." The district

21

court posited that the legislature could have addressed that concern by raising "the limit when a nonparticipant went over the cap." The court stated that such a solution would be permissible under Davis because "Davis expressly said that, if the provision raised the contribution limit for both candidates, for all candidates, it would be constitutional." The district court, however, explained that the legislature may not have wanted to adopt that solution because "keeping the $500 limit fights corruption better." Additionally, "raising the limit late in the game isn't very workable" because it would be difficult for "candidates [to] go back to his or her contributors and seek more money." The district court concluded that the legislature "could reasonably decide, I'm not going to raise the limit; I don't want to hamstring the candidate who has opted in; and, thus, promoting the anticorruption goal." "And so the legislator can reasonably say, what I'm going to do is match the expenditures by the candidate that goes over. That way, I have offset the effect of the $500 cap on contributions." The district court conceded that it could find "no legislative history that sets it out quite like that," but stated that it found "it telling that the $500 cap came in at the same time as public financing, and that the [excess spending subsidy] came in as part of it."

## II. STANDARD OF REVIEW

We review the decision to deny a preliminary injunction for abuse of

22

discretion. <u>Solantic, LLC v. City of Neptune Beach</u>, 410 F.3d 1250, 1253–54 (11th Cir. 2005). In so doing, we review the findings of fact of the district court for clear error and legal conclusions <u>de novo</u>. <u>This That & the Other Gift & Tobacco, Inc. v. Cobb Cnty., Ga.</u>, 285 F.3d 1319, 1321 (11th Cir. 2002). A party seeking a preliminary injunction bears the burden of establishing its entitlement to relief. <u>Citizens for Police Accountability Political Comm. v. Browning</u>, 572 F.3d 1213, 1217 (11th Cir. 2009). In considering the propriety of preliminary relief, we consider four factors: (1) whether there is a substantial likelihood that the party applying for preliminary relief will succeed later on the merits; (2) whether the applicant will suffer an irreparable injury absent preliminary relief; (3) whether the harm that the applicant will likely suffer outweighs any harm that its opponent will suffer as a result of an injunction; and (4) whether preliminary relief would disserve the public interest. <u>E.g.</u>, <u>Burk v. Augusta-Richmond Cnty.</u>, 365 F.3d 1247, 1262–63 (11th Cir. 2004). When the state is a party, the third and fourth considerations are largely the same. <u>Garcia-Mir v. Meese</u>, 781 F.2d 1450, 1455 (11th Cir. 1986).

## III. DISCUSSION

Scott contends that he is entitled to a preliminary injunction because his complaint under the First and Fourteenth Amendments is likely to succeed, the

23

burden on his right to free speech is irreparable, and, as the district concluded, the balance of the harms and the public interest do not counsel against an injunction. The Secretary and McCollum disagree with all of those statements. We agree with Scott.

We address the propriety of preliminary relief in four parts. First, we explain that Scott is highly likely to succeed on his claim that the excess spending subsidy severely burdens his constitutional rights. Second, we explain why Scott's injury is irreparable. Third, we explain that the balance of the harms and considerations of the public interest do not counsel against relief. Fourth, we conclude by addressing the propriety of preliminary relief in the light of our analysis in the first three sections.

*A. Scott's First Amendment Claim Is Likely to Succeed on the Merits.*

Scott argues that the excess spending subsidy is unconstitutional because it severely burdens his right to spend in support of his candidacy and is thus subject to strict scrutiny, which it cannot survive. He argues that Davis compels this conclusion. The Secretary and McCollum respond that the subsidy does not substantially burden Scott's right to spend in support of his candidacy and is not subject to strict scrutiny. They argue that Davis is inapposite, but even if it applies, they argue that the subsidy survives strict scrutiny because it furthers the legitimate

24

interest of Florida in preventing corruption and the appearance of corruption in politics. They contend that the subsidy encourages participation in the public campaign financing system and the public financing system prevents corruption and the appearance of corruption.

We agree with Scott that <u>Davis</u> requires us to subject the excess spending subsidy to strict scrutiny. We conclude that, even if the subsidy encourages participation in the public financing system and indirectly prevents corruption or the appearance of corruption, the excess spending subsidy is not the least restrictive means of doing so.

Like the district court, we think it is obvious that the subsidy imposes a burden on nonparticipating candidates, like Scott, who spend large sums of money in support of their candidacies. When a nonparticipant vying for public office in Florida spends more than $2 for each registered voter in support of his candidacy, Florida provides direct financial support to his opponents. These participating opponents use this money to further their own candidacies and attempt to defeat the candidacy of the nonparticipant. When the participating candidates speak in support of their own candidacies, they raise the cost of their nonparticipating opponent's speech in support of his candidacy. Neither McCollum nor Scott disagrees with this fact. Indeed, that is why Scott is seeking to invalidate the

subsidy and McCollum is defending it. Moreover, we know of no court that doubts that a subsidy like the one at issue here burdens nonparticipants, apart from whether it is a substantial burden under the First Amendment. See Green Party of Conn. v. Garfield, - - F.3d - - , Nos. 09-3760-cv(L), 09-3941-cv(CON), slip op. 1, at 49 (2d Cir. July 13, 2010); McComish, slip op. at 9164 (acknowledging but not finding constitutionally significant the loss of "competitive advantage in elections"); N.C. Right to Life Comm. Fund for Indep. Political Expenditures v. Leake, 524 F.3d 427, 437 (4th Cir. 2008) (same); Daggett v. Comm'n on Governmental Ethics & Election Practices, 205 F.3d 445, 464–65 (1st Cir. 2000) (same).

We agree with Scott and the district court that, under Davis, the burden of Scott's right of free speech is substantial. Davis, a candidate for the United States House of Representatives, sued to enjoin enforcement of section 319(a) of the Bipartisan Campaign Reform Act of 2002, otherwise known as the "Millionaire's Amendment." 128 S. Ct. at 2766–67. Section 319(a) provided that, if Davis spent enough of his own personal funds in support of his candidacy so that he could be described as self-financing, his opponent could accept campaign contributions of up to $6,900. Id. at 2766 & n.5. Davis would still have been limited to accepting campaign contributions of $2,300 or less. Id. at 2766. Davis alleged that the

26

asymmetrical contribution limits that applied when he self-funded his campaign unconstitutionally burdened his right to make unlimited expenditures in support of his campaign "because making expenditures that create the imbalance has the effect of enabling his opponent to raise more money and to use that money to finance speech that counteracts and thus diminishes the effectiveness of" his own speech. Id. at 2770. The Supreme Court agreed with this argument and invalidated the Millionaire's Amendment because it did not satisfy a compelling government interest. Id. at 2772–74. Davis described as an "unprecedented penalty," a "special and potentially significant burden," a "drag," an "abridgment," and a "substantial burden" the grant of the right to an opponent to raise funds under a relaxed contribution cap. Id. at 2771–72. That is, a candidate exercising his right to spend without restriction his personal funds on his campaign is burdened substantially when his opponent is permitted the opportunity to raise more money than he otherwise would have been permitted to raise.

Like both the district court and the Second Circuit, we conclude that the burden that an excess spending subsidy imposes on nonparticipating candidates "is harsher than the penalty in Davis, as it leaves no doubt" that the nonparticipants' opponents "will receive additional money." Green Party, slip op. at 49 (emphasis omitted). Although Davis concerned a discriminatory contribution system that

27

burdened a self-funding candidate, what triggered strict scrutiny was the grant of a competitive advantage—an increase in the ability of Davis's opponent to speak. 128 S. Ct. at 2772 ("[T]he vigorous exercise of the right to use personal funds to finance campaign speech produces fundraising advantages for opponents in the competitive context of electoral politics."). Davis also cited Day v. Holahan, 34 F.3d 1356, 1359–60 (8th Cir. 1994), which involved a subsidy to publicly financed candidates that was tied to independent expenditures against those candidates, for the proposition that the Millionaire's Amendment imposed a "special and potentially significant burden." 128 S. Ct. at 2772. That is, the Supreme Court equated the Millionaire's Amendment with a statute that enabled the opponent of a complaining candidate. Moreover, we doubt that the Court would describe as such a significant burden the relaxation of a contribution limit that only ever applies to candidates who, by definition, are mostly not relying on contributions. Finally, the majority opinion in Davis, after establishing that the Millionaire's Amendment warranted strict scrutiny, all but stated that it was not thinking about the law in terms of contribution limits. See id. at 2772 n.7 ("Even if § 319(a) were characterized as a limit on contributions rather than expenditures, it is doubtful whether it would survive.").

Although under Davis the subsidy must be "justified by a compelling state

28

interest," id. at 2772 (internal quotation marks omitted), the Secretary and McCollum insist that the subsidy satisfies that test. They argue that the excess spending subsidy furthers the interest of the state in fighting corruption and the appearance of corruption, which the Supreme Court has suggested is probably the only compelling interest that can justify a substantial burden on expenditures. See id. at 2773 (citing Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 428, 120 S. Ct. 897, 926 (2000) (Thomas, J., dissenting) ("[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." (internal quotation marks omitted))). The Secretary and McCollum contend that the subsidy furthers the anticorruption interest by encouraging participation in the public campaign financing system of Florida, which in turn prevents corruption or the appearance of corruption. This argument is not novel. See Gable v. Patton, 142 F.3d 940, 947 (6th Cir. 1998); cf. Fed. Election Comm'n v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 514–18, 105 S. Ct. 1459, 1477–79 (1985) (White, J., dissenting). We are willing to assume, for the sake of argument, that the subsidy encourages participation in the public financing system of Florida. See Gable, 142 F.3d at 950.

The parties have not sufficiently explained how the Florida public financing

29

system furthers the anticorruption interest. As we understand the system, it enables candidates who are willing to accept limits on personal expenditures and campaign expenditures, and it grants participating candidates public money. In all other respects, the system enables candidates who run campaigns that are indistinguishable from the campaigns of nonparticipants like Scott. At this early stage, we outline our concerns as follows.

The limit that the public campaign financing system imposes on the personal expenditures of participating candidates does not appear to reduce corruption or the appearance of corruption. The Supreme Court has explained that "the use of personal funds reduces the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse" of campaign contributions. Buckley, 424 U.S. at 53, 96 S. Ct. at 651. The Supreme Court reaffirmed this principle in Davis when it held that discouraging the use of personal funds by wealthy candidates for federal office "disserves the anticorruption interest." 128 S. Ct. at 2773. Thus, by encouraging individuals to accept a limit on personal expenditures, the subsidy does not appear to reduce corruption.

The limit on general campaign expenditures also does not appear to enable candidates who are, or may be perceived as being, less corrupt than their

nonparticipating peers. As we have explained, in Florida, every candidate for public office, whether participating or not, is subject to a $500 limit on campaign contributions. Fla. Stat. § 106.08(1)(a). And when contributions are so limited, the Supreme Court has told us that a limit on general campaign expenditures does not serve the anticorruption interest. "The major evil associated with rapidly increasing campaign expenditures is the danger of candidate dependence on large contributions." Buckley, 424 U.S. at 55, 96 S. Ct. at 652. And "[t]he interest in alleviating the corrupting influence of large contributions is served by . . . contribution limitations." Id. Indeed, in a state like Florida that aggressively limits campaign contributions, general campaign expenditures, excepting those of self-funding candidates, reflect "the size and intensity of the candidate's support." Id. at 56, 96 S. Ct. at 652.

At bottom, the Florida public campaign financing system appears primarily to advantage candidates with little money or who exercise restraint in fundraising. That is, the system levels the electoral playing field, and that purpose is constitutionally problematic. Id. at 56–57, 96 S. Ct. at 652–53. The Supreme Court explained in Davis, "[d]ifferent candidates have different strengths" and "[l]eveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an

31

election." 128 S. Ct. at 2773–74; see also Buckley, 424 U.S. at 56–57, 96 S. Ct. at 653 ("[T]he equalization of permissible campaign expenditures might serve not to equalize the opportunities of all candidates, but to handicap a candidate who lacked substantial name recognition or exposure of his views before the start of the campaign."). The Supreme Court has explained that a state cannot burden a candidate's First Amendment rights for the reason that, in Scott's words, "he is a newcomer to the political scene who has the financial resources to mount a credible challenge to entrenched career politicians."

None of this is to say that the public financing system of Florida does not benefit the people of Florida or that public financing generally is not a system worthy of public resources. Buckley, 424 U.S. at 92–93, 96 S. Ct. at 670 (explaining that a federal system of public financing of election campaigns represents a legislative effort "not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people" and thereby "furthers . . . pertinent First Amendment values"). In some circumstances, public financing may serve an anticorruption interest by "eliminating the improper influence of large private contributions." Id. at 96, 96 S. Ct. at 671. It is only to say that Florida, in the light of the election laws it has adopted, cannot impose a "special

32

and potentially significant burden," <u>Davis</u>, 128 S. Ct. at 2772, on the First Amendment rights of nonparticipating candidates who do not wish, for whatever reason, to accept public money and its attendant limitations on the theory that its public financing system reduces actual or apparent corruption. Perhaps the parties, under the supervision of the district court, may want to develop the record more about this matter.

Even if we were certain that the public financing system of Florida furthers an anticorruption interest, we agree that Scott has proved a likelihood that the excess spending subsidy is not the least restrictive means of encouraging that participation. Scott argues that Florida can effectively encourage participation in "innumerable ways." Scott contends that Florida could provide a larger initial grant of public funds to participating candidates, increase the amount of its matching contributions on qualifying fundraising, or institute progressively higher matching ratios for participating candidates who prove able to raise money from contributors. Scott also does not object to the provision that releases McCollum from the expenditure ceiling that applies to publicly funded candidates after Scott exceeds that same ceiling. Although at some point even enticements not tied to protected speech might render a "voluntary" public financing system that includes expenditure limits compulsory in violation of the First Amendment, <u>e.g.</u>, <u>N.C.</u>

33

Right to Life Comm., 524 F.3d at 436, we accept for purposes of this appeal Scott's concession that Florida could implement these rules.

We agree with Scott that Florida could encourage participation to virtually the same degree that it maintains it currently does by doing no more than releasing participating candidates from the expenditure ceiling. This release would place participating and nonparticipating candidates on equal footing, except that participating candidates could not spend as much of their own personal resources in support of their campaigns. So the only prospective candidates who would resist participating under this system would be the wealthy, who already have less incentive to join. Consequently, this system would be no less effective than the system currently in place, but would burden nonparticipating candidates to a lesser degree. Florida has given us no reason to think that this system would be less effective, which is its burden when one of its laws is subject to strict scrutiny under the First Amendment. E.g., United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 816–17, 120 S. Ct. 1878, 1887–88 (2000).

In sum, Davis requires that Florida justify the excess spending subsidy by establishing that it furthers a compelling state interest. Florida has stated that the excess spending subsidy furthers its anticorruption interest by encouraging participation in its public financing system. Florida has not, however, proved that

34

the excess spending subsidy furthers the anticorruption interest in the least restrictive manner. Scott is likely to prevail on the merits of his claim.

### B. Scott's Injury Is Irreparable.

Scott argues that the harm he stands to suffer if we do not grant preliminary relief is "irreparable." Scott contends that when he triggers the excess spending subsidy, he will speak less than he wants. Moreover, he states that he will direct more of his speech through section 527 organizations, which cannot speak unfettered in favor of his candidacy. The district court credited these claims. Neither the Secretary nor McCollum denies that these harms will accrue if we do not enjoin enforcement of the excess spending subsidy. Instead, they argue that Scott has no right, under the First Amendment, to avoid those harms, but that argument is about whether Scott is likely to succeed later on the merits.

Scott's alleged injury is obviously irreparable. An injury is irreparable "if it cannot be undone through monetary remedies." Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987). Even when a later money judgment might undue an alleged injury, the alleged injury is irreparable if damages would be "difficult or impossible to calculate." Fla. Businessmen for Free Enter. v. City of Hollywood, 648 F.2d 956, 958 n.2 (5th Cir. Unit B June 1981). We have repeatedly held that harms to speech rights "'for even minimal periods of time, unquestionably

35

constitute[] irreparable injury'" supporting preliminary relief. Id. at 958 (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976)); see also KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1271–72 (11th Cir. 2006); Let's Help Fla. v. McCrary, 621 F.2d 195, 199 (5th Cir. 1980). "The rationale behind these decisions [is] that chilled free speech . . . , because of [its] intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole." Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990). Scott has established irreparable injury.

*C. Each Candidate Will Suffer if He Loses This Appeal, and a Preliminary Injunction Would Not Be Adverse to the Public Interest.*

The parties have opposite views of the relative magnitude of the harms likely to befall them if we grant or deny preliminary relief. Scott argues that the harm so far inflicted upon his ability to speak in support of his campaign is "significant" and "will only deepen" if we do not enjoin operation of the excess spending subsidy. Scott argues that the Secretary has no interest in enforcing the subsidy and that McCollum would not be harmed by an injunction because he would remain free to fundraise and spend money in support of his candidacy free of the expenditure cap under which he is currently operating. McCollum responds that he would be seriously harmed by an injunction because it would "leave him at

36

a severe disadvantage for the crucial homestretch of the campaign and would impede his ability to convey his message to the electorate." The Secretary, for her part, contends that an injunction would generate chaos in the final weeks of the campaign and disserve the anticorruption interest of the state. McCollum echoes the concern that an injunction would "thwart the State from running a fair and orderly gubernatorial election." The Secretary and McCollum also maintain that we should consider that Scott could have filed suit to enjoin the excess spending subsidy at least three months ago and that participating candidates like McCollum have developed campaign strategies in reliance on the subsidy, but we doubt that an earlier complaint would have been ripe so as to satisfy the constitutional requirements of a justiciable controversy. Texas v. United States, 523 U.S. 296, 300, 118 S. Ct. 1257, 1259–60 (1998). Scott replies that his opponents could not reasonably have relied on the subsidy in the light of the legal cloud that has long surrounded such laws.

No party to this appeal is obviously worse served by a preliminary injunction. On this record, we think that each candidate will speak less if he loses this appeal. Scott will avoid aiding his opponent and McCollum will have less money to support his campaign. We cannot say that the public has an interest in hearing more or less from either party.

37

We also cannot say that enjoining the subsidy will disrupt the looming election. An injunction would require the Secretary to do nothing and permit Scott and McCollum to carry on campaigning as they have for the last several months. This appeal is not a case in which preliminary relief would require the state to cancel or reschedule an election, discard ballots already cast, or prepare new ballots or other election materials. Cf. Nader v. Keith, 385 F.3d 729 (7th Cir. 2004); Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914 (9th Cir. 2003) (en banc).

The equities similarly do not clearly counsel against or in favor of preliminary relief. The district court found that McCollum has not planned his campaign spending in reliance on the subsidy, but has instead spent what he has to avoid falling even farther behind his main opponent. McCollum contends that his affidavit, and the affidavit of his campaign manager, directly contradict that finding. Whether or not this finding is clearly erroneous, it is not inequitable to upset this reliance.

McCollum should have known that the excess spending subsidy was vulnerable to legal challenge. On the day that the Supreme Court decided Davis, a leading scholar of election law wrote that the decision "calls all [asymmetrical] provisions in public financing systems into question." Rick Hasen, Initial

38

Thoughts on FEC v. Davis: The Court Primes the Pump for Striking Down Corporate and Union Campaign Spending Limits and Blows a Hole in Effective Public Financing Plans, Election Law Blog (June 26, 2008, 7:55 AM), http://electionlawblog.org/archives/011095.html (all Internet materials as visited July 30, 2010, and available in the Clerk of the Court's case file). After Davis and before Scott entered the Florida Republican primary, two federal district courts had declared similar state laws unconstitutional. See McComish, slip op. 9139; Green Party of Conn. v. Garfield, 648 F. Supp. 2d 298 (D. Conn. 2009). We agree with the district court that if McCollum did not know that he could not comfortably rely on a subsidy under section 106.355 in the event that an opponent ran an expensive campaign it cannot be said that his reliance was reasonable.

Moreover, the finding of the district court that Scott did not purposefully delay filing suit is not clearly erroneous. For the reasons that McCollum should have known that the excess spending subsidy was possibly illegal, so should have Scott. But the record supports a finding that Scott, who had never run a campaign of any sort in Florida, may not have understood until he began campaigning just how expensive the campaign he hoped to run would prove. That Scott also apparently stated publicly that he would not exceed the Florida expenditure limit is probably a reflection of that inexperience, instead of the result of calculated

39

misdirection.

In sum, each candidate stands to suffer if he loses this appeal and it is not obvious who stands to suffer more. The public is similarly harmed to a small degree no matter the outcome, as it is likely to hear less from one or the other candidate, but there is no danger of disrupting the looming election. We cannot say that granting preliminary relief would be unfair to McCollum.

*D. Scott Is Entitled to a Preliminary Injunction.*

Scott has persuaded us that he is entitled to preliminary relief. For the reasons we have stated, Scott is exceedingly likely to prevail on the merits of his claim that the excess spending subsidy violates the First Amendment. Davis compels this conclusion. Moreover, as we have explained, preliminary relief would not be adverse to the public interest.

On this record, because Scott is highly likely to prevail after a full trial on the merits, we must enjoin the operation of the excess spending subsidy. Courts have often treated the likelihood of success on the merits as dispositive where, as here, difficult to quantify and apparently similar harms are at issue. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.3 (2d ed. 1995). "[T]he less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the

40

public interest and balance of hardships tip in their favor." Sw. Voter Registration Educ. Project, 344 F.3d at 918. We have even treated the merits as influencing our view of the relative severity of the harms. Most relevant here, when assessing the severity of burdens on speech, we have held that "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury." KH Outdoor, 458 F.3d at 1272. Similarly, we have held that the public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law. See id. ("[T]he city has no legitimate interest in enforcing an unconstitutional ordinance."); Fla. Businessmen for Free Enter., 648 F.2d at 959 ("Given appellants' substantial likelihood of success on the merits, however, the harm to the city from delaying enforcement is slight."). So we are in complete agreement with the view of the district court that Scott is entitled to relief if his claim is likely to succeed. Although we appreciate the careful consideration the district court accorded these difficult issues, we disagree with the final step of its reasoning.

One final point about severance, because the district court raised the issue. The district court suggested that, in the light of its view of the manner in which the excess spending subsidy encouraged participation in the public financing system, invalidating the subsidy might also require invalidating the $500 contribution limit. It is not clear whether the district court thought that it might have to strike the

contribution limit as it applied to all candidates or only participating candidates. No party, however, suggests that we cannot preliminarily enjoin enforcement of the excess spending subsidy without also preliminarily enjoining enforcement of other provisions of the Act, and Scott argues that consideration of the severance issue is premature anyway.

Consideration of the issue of severance might be premature because we will not invalidate—only preliminarily enjoin—the excess subsidy provision, but we have no problem concluding that the excess spending subsidy is severable. Florida "clearly favors (where possible) severance of the invalid portions of a law from the valid ones." Solantic, 410 F.3d at 1269 n.16 (internal quotation marks omitted). Florida employs a well-established four-part test to determine whether severance is appropriate: (1) the unconstitutional provision can be separated from the remaining valid provisions; (2) the legislative purpose of the act can be achieved without the invalid provision; (3) the valid and invalid features are not so inseparable that the legislature could only have wanted them to exist together; and (4) a complete act remains after severance. Women's Emergency Network v. Bush, 323 F.3d 937, 948–49 (11th Cir. 2003). Here, as is "in almost any case," we can easily separate the excess spending subsidy from the remainder of the Act and the Act remains complete even after severance. Id. at 949. We disagree with the district court that,

because the legislature adopted a $500 limit on private contributions when it created the excess spending subsidy, the two provisions are tied so that we could not enjoin the operation of only the subsidy. The $500 limit on private contributions is generally applicable so that it burdens all candidates even when none accept public funds. Moreover, we have little trouble concluding that the Florida Legislature would want to sever the subsidy because the Act contains a severability provision that applies to "any provision of [the] act," 1991 Fla. Sess. Law Serv. ch. 91-107 § 36. See Smith v. Dep't of Ins., 507 So. 2d 1080, 1090 (Fla. 1987). For the reasons that we concluded that the subsidy was not narrowly tailored to the goal of encouraging participation in the public financing system, we also conclude that the legislative purpose of the Act can be served without the subsidy.

## IV. CONCLUSION

The judgment of the district court is **REVERSED**. Because Scott has established his entitlement to a preliminary injunction, it is ordered that the Interim Secretary of State of Florida, Dawn K. Roberts, and all officers, agents, and employees of the office of the Secretary of State are **PRELIMINARILY ENJOINED** from releasing funds to Ira William ("Bill") McCollum Jr., under the excess spending subsidy of section 106.355 of the Florida Election Campaign

43

Financing Act, Fla. Stat. § 106.355.  Our jurisdiction over this appeal, 28 U.S.C. § 1292(a)(1), "does not defeat the power of the trial court to proceed further with the case."  16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3921.2, at 53 (2d ed. 1996).  "It was not intended that the cause as a whole should be transferred to the appellate court prior to the final decree."  Ex parte Nat'l Enameling & Stamping Co., 201 U.S. 156, 162, 26 S. Ct. 404, 406 (1906).

**REVERSED AND PRELIMINARY INJUNCTION ENTERED.**